## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEREMY MACK,                                    :

                           PLAINTIFF, :

            V.                              :

THE FEDERAL BUREAU OF PRISONS, THOMAS R.   :

KANE, JOSEPH L. NORWOOD, M. CARVAJAL,   :

DAVID J. EBBERT, ASSOC. WARDEN T. JUSINO, :

ASSOC. WARDEN JEFFREY BUTLER, ASSOC.   :

WARDEN KAZUBA, CAPTAIN J. RHODES, DEPUTY   :

CAPTAIN BRENT TAGGART, DEPUTY CAPTAIN   :

JOHN KONKLE, S.I.S. JOHN DOE, LT. DALLAS   :

BEACHEL, LT. KEMMERER, C.O. K. SHEESLEY,   :

C.O. J. FINCK, C.O. B. CHAPPELL, C.O.   :

SAVIDGE, C.O. D. SULLIVAN, C.O. B.   :

BEAVER, C.O. HACKENBURG, C.O. J. MOYER,   :

C.O. G. SEAGRAVES, AND C.O. M. DELMONICO, :

                         DEFENDANTS. :

                                :

**FILED**
**SCRANTON**

FEB 2 0 2019

Per_____
               DEPUTY CLERK

CASE NO.:

4:19cv300

JURY TRIAL DEMANDED

CIVIL COMPLAINT

### JURISDICTION

1. Plaintiff brings this Action under the First, Fifth and Eighth Amendments to the United States Constitution and under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

2. This court has subject matter jurisdiction over the federal claims presented presented herein pursuant to 28 U.S.C. Sections 1331 and 1343.

### VENUE

3. Venue is proper in this District pursuant to 28 U.S.C. Sec. 1391 (b), because a substantial part of the acts or omissions that gave rise to Plaintiffs' claims occurred in Union County Pennsylvania, in the Middle District of Pennsylvania,

### PARTIES

1.

4. Plaintiff, Jeremy Mack, was at all times relevant to this Action a prisoner incarcerated at USP Lewisburg in the SMU, a federal prison operated by the Bureau of Prisons ("BOP"), located in Union County, Pennsylvania.

5. Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice ("DOJ"), and is responsible for the administration of federal prisons, including USP Lewisburg. The BOP is charged with establishing ploicies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

6. Defendant Thomas R. Kane was at all times relevant to this action the Acting Director of the Bureau of Prisons. Mr. Kane is being sued in his official Capacity.

7. Defendant Joseph L. Norwood was at all times relevant to this action the Regional Director of the Northeast Region for the BOP, which includes USP Lewisburg. Mr. Norwood is being sued in his official capacity.

8. Defendant  M. Cavajal is the Regional Director of the Northeast Region for the BOP, which includes USP Lewisburg. Mr. Carvajal is being sued in his official capacity.

9. Defendant David J. Ebbert is the Warden of USP Lewisburg. Mr. Ebbert is being sued in his individual and official capacities.

10. Defendant T. Jusino at all times relevant to this action an Associate Warden at USP Lewisburg. Ms. Jusino is being sued in her individual and official capacities.

11. Defendant Jeffrey Butler was at times relevant to this action an Associate Warden at USP Lewisburg. Mr. Butler is being sued in his individual and official capacities.

12. Defendant Kazuba was at times relevant to this action an Associate Warden at USP Lewisburg. Mr. Kazuba is being sued in his individual and official capacities

13. Defendant J. Rhodes was at times relevant to this action a Captain at USP Lewisburg. Mr. Rhodes is being sued in his individual and official capacities.

14. Defendants Brent Taggart and John Konkle was at times relevant to this action Deputy Captains at USP Lewisburg. Mr. Taggart and Mr. Konkle are both being sued in their individual and official capacities.

15. Defendant S.I.S. John Doe was at all times relevant to this action a Special Invetsigation Services ("SIS") officer at USP Lewisburg, who was responsible for for overseeing the monitoring of inmates mail at USP Lewisburg. Mr. Doe is being sued in his individual and offical capacities.

16. Defendants Dallas Beachel and Kemmerer was at all times relevant to this action Lieutenants ("Lt.s") at USP Lewisburg. Mr. Beachel and Mr. Kemmerer are both being sued in their individual and official capacities.

17. Defendants K. Sheesley, J. Finck, B. Chappell, Savidge, D. Sullivan, B. Beaver, Hackenburg, J. Moyer, G. Seagraves, and M. Delminico was at all times relevant to this action Correctional Officers ("C.O.s") at USP Lewisburg. Mr. Sheesley, Mr. Finck, Mr. Chappell, Mr. Savidge, Mr. Sullivan, Mr. Beaver, Mr. Hackenburg, Mr. Moyer, Mr.Seagraves, and Mr, Delmonico are al being sued in their individual and official capacities.

## FACTS

### Mr. Macks' Commitment to the Custody of the BOP
### and Designation to the BOP's Special Management Unit

18. In the matters of The United States of America v. Mack et al, Case No. 1:13 -cr-00278-SL-1, on February 18,2014 Mr. Mack was found guilty by a jury trial on all nine counts of a superseding Indictment, for which he was charged with 4-counts of Sex-Trafficking, 1-count of conspiracy to Sex-Trafficking, 2-counts of distrtidution of a controlled substance, and 2-counts of Obtruction of Justice.

19. Of the 4-counts of Sex-Trafficking, for which Mr. Mack was convicted, one count involved a minor who was 16 years old. However, the minor lied to Mr. Mack about her age and presented herself to everyone at his house like she was an adult. (Trial Trans., Doc. 197,3291)

20. On June 12,2014 Mr. Mack was sentenced to the custody of the BOP for life without the possibility of parole, as a "Sex-Offender."

21. The BOP took custody of Mr. Mack and transferred him to the United States Penitentiary Tucson ("USP Tucson"), in Tucson, Arizona, on June 27,2014.

22. At that time USP Tucson was the only high security Sex-Offender ("SO") prison within the BOP.

23. On November 11,2014 Mr. Mack's cell was searched by staff and a homemade weapon was found. Mr. Mack admitted to possessing the weapon for his safety. He received an incident report and was placed in USP Tucson's Special Housing Unit ("SHU"), pending disposition of the weapons charge.

24. On March 3,2015 Mr. Mack received a copy of "NOTICE TO INMATE: Hearing Referral for Designation to a Special Management Unit," in relation to the November 11, 2014 weapon's charge.

25. Mr. Mack's Hearing of Referral for Designation to a Special Management Unit commenced on March 12, 2015, and was held via telephone-conference. The Hearing Administrator concluded that Mr. Mack had met the Criteria for SMU Designation.

General Background and Operation of The
USP Lewisburg Special Mangement Unit

26. The BOP created the SMU Prorgam to house men determined to have unique security and management concerns. Conditions of confinement for men in the SMU are more restrictive than for those in a General Population environment in a high security Penitentiary.

27. The BOP established the SMU Program on November 19, 2008, when it published Program Statement 5217.01. In 2009 the BOP transformed USP Lewisburg from a reguler Penitentiary to a SMU. ON August 9,2016, as a result of recommendations made in the Department's January 2016 Restrictive Housing Report, the BOP Published a new SMU Policy, Program Statement 5712.2, which rescinded Program Statement 5712.01.

28. According to BOP Policies, the SMU is a multi-level program whose mission is to teach self-discipline, pro-social values, and the ability to coexist with members of other cultural, geographical, and religous backgrounds. SMU designation is supposedto be non-punitive. The BOP can send any individual to the SMU that it has determined requires "greater management" and meets certain other criteria specified by the BOP, specifically, any sentenced prisoner whose interactions with others requires greater management than for those in a general population environment may be designated to an SMU to ensure the safety, security, or orderly operation of BOP facilities, or the protection of the public, if the prisoner meets any of the following criteria:

       a. The prisoner participated in or had a leadership role in disruptive geographical group-or gang-related activity;

       b. The prisoner committed any "100-level" prohibited act, according to 28 C.F.R. pt. 541, after being classified as a memeber of a "Disruptive Group" pursuant to 28 C.F.R. pt. 524;

       c. The prisoner has a history of serious or disruptive disciplinary infractions;

       d. The prisoner participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility; and/or

       e. The prisoner participated in or was associated with activity such that greater management of the inmate's interactions with other persons is necessary to ensure the safety, security, or orderly operation of BOP facilities or protection of the public.

29. The SMU program has different levels that the men process through until, idealy, they graduate from the program and can be moved to a general population or placed in another facility.

30. In the SMU's original formulation, ther were four levels and men were expected to take 18-24 to complete the full program. With the August 9, 2016 Program Statement 5712.02, the BOP shortened the length of the SMU program from four levels to three and specified a 12-month timeframefor completion.

31. Each of the levels also has an expected timeframe for completion: under Program Statement 5712.02, this is 6-8 months for Level 1, 2-3 months for Level 2, and 1-2 months for Level 3. However, men can remain at any given level for significantly longer than the expected completion time if the BOP finds that they are not ready to progress to the next level.

32. Additionally, men who receive disciplinary violations can be sent back to Level 1 where they must begin the program over again. Under Program Statement 5712.02, men can be cycled through the prorgam for up to 24 months before being designated as "SMU FAIL" status.

33. Under Program Statement 5712.01 there was no outer limit on the length of time men could remain in the SMU. As a result, some men housed in the SMU had been there since the program's inception.

34. The three levels also afford the men different privileges. For the vast majority of the men in the SMU, their conditions of confinement are extremely restrictive. Men at Levels 1 and 2 remain in their cells for 23 hours a day. Although the men are supposed to receive some access to telephones, telephone privileges have been rescinded for many of the men due to alleged disciplinary violations.

35. At each of the levels, the men must meet different milestones for progression. An individual's progression through Level 1 is based upon his compliance with behavioral expectations. Progression through Level 2 is based on the individual demonstrating potential for positive "community" interaction skills. Individuals who targetted by staff with harassment or inmates for retaliation find it very challenging, if not impossible, to meet these milestones, and find themselves being cycled through the SMU program multiple times and frequently ending as "SMU Fail."

36. Men in the SMU are allowed anly a maximum of 5 hours of recreation per week and frequently get less or none. The recreation time is spent in adjoined cages that are approximately eight feet by twenty feet. Sometimes men are alone in the cage for recreationand other times there are as many as six individuals in one cage.

Individuals can not choose whom they are placed in the cage with . Many individuals choose not to go out of their cells to recreation cages due to their fear of being attacked by a hostile inmate or being assaulted by staff while handcuffed behind their back, and thus remain in their cells 24 hours a day.

37. Men are placed together in cells throughout their time in the SHU, regardless of the men's self-professed inability to get along with others or history of violence.

38. These conditions place inmates with a history of violence and gang membership in close quarters for every hour of everyday, leading to an obvious and pervasive threat of violence.

39. It is the responsibility of the BOP, the Northeast Regional Office of the BOP, and all officials and correctional officers at USP Lewisburg to ensure that this threat of violence does not become a reality.

40. Because of this known potential for inmate on inmate violence, upon entering the SMU Program at USP Lewusburg, inmates participate in an intake interview with USP Lewisburg officials, often referred to as a "quay" hearing.

41. One of the purposes of this interview is to gather information about the men so that prison officials can make safe and appropriate placement decisions for the men and avoid placing hostile inmates together.

42. At this intake interview, security information in the men's BOP file is reviewed and inmates disclose their separation needs and known enemies.

43. Folling the intake interview, the new men are given a cell block assignment and recreation cage schedule. These placement decisions are determined in part by the cell assignment committee (The Committee), with assistance from the correctional officers on each cell block.

44. Upon information and belief, at all times relevant to this action the Committee included Defendants Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, and Konkle.

45. Defendants Jusino, Butler, and Kazuba are specifically tasked by the BOP's SMU Program Statement with inmate placement decisions: "The Associate Warden is responsible for determining which inmates may be housed or participate in activities together, as necessary to protect the safety, security, and good order of the institution." See U.S Dept. of Justice, Program Statement: Special Management Units Section 6.

46. In making decisions on inmate placement, the Committee is required to consider inmate safety. Therefore, the Committee is required to account for an inmate's particular need to be separated from other individuals or groups inside the prison who are hostile towards him.

47. Some categories of inmates who are known to be hostile to one another are rival gang members and inmates who are known to be assaultive to other cellmates. A "hostile" inmate may also be someone who has had a particular conflict with the proposed cellmate or his associates.

48. Information discussed at the quay hearing, as well as information about separation needs, is shared with staff so that staff can carry out their duties.

49. After the quay hearing, men continue to inform corrections staff of new enemies or geographic groups or gangs that they believe pose a substantial risk of material harm to them.

50. A small percentage of men in the SMU have verified protection needs and are unable to live in housing units amongst the general population because of the influence, harassment, intimidation, and threats of violence from members of gangs and "cars" (prison based geographical groups/gangs in the BOP).

51. Inmates may be classified as Protected Custody ("PC") status in matters related to the following circumstances:

* The inmate was a victim of an assault, or was being threatened by other inmates.
* The inmate's safety is threatened because of providing, or being perceived as having provided, information to staff or law enforcement authorities regarding other inmates or people in the community.
* The inmate refuses to enter general population because of alleged pressures or threats from unidentified inmates, or for no expressed reason.
* The inmate is a "drop-out" (x gang member).
* The nature of the inmate's criminal offense, particularly sex-offenders
* Based on evidence, staff believe that the inmate's safety may be seriously jeopardized by placement in general population.

52. Due to the wide spread presence of the gang factions and extensive presence of Security Threat Group ("STG") members, especially in the SMU, the difficulties on the management of the gang problem exacerbate the Protective Custody Problem. See Audit, conducted by Center of Naval Analysis. CNA, Federal Bureau of Prisons: Special Housing Review and Assessment (December 2014),218.

53. USP Lewisburg have developed a specialized Protective Custody housing unit to manage SMU inmates who have verified protection needs. At all times relevant to this action X-block (otherwise known as Z-block) has been the SMU's designated Protective Custody Housing Unit.

54. There are many C.O. at the SMU who constantly harass and threaten inmates

inmates who are sex-offenders. These C.O.'s usually make it known to other inmates on the cell-block which inmates are sex-offenders as an effort to purposely jeopardize these inmates safety and well-being. And, often times, certain correctional staff force sex-offenders to cell with hostile inmates to intentionally cause them to suffer physical and psychological harm.

55. Many courts and numerous sociological and Criminal Justice studies have concluded that "the Sex Offender label severely stigmatizes an individual" and that "sex offenders are considered 'an anathema in the inmate subculture...'" and "inmate norms call for their savage beating.'" Renchenski v. Williams, 622 F.3d 315, 326-27 (3d Cir. 2010)

56. Inmate "prison politics" dictates that an inmate who receives a cellmate who is a "SO" must "smash" (violently assault) the "SO" or he will get "smashed" when he goes back to general population or gets another cellmate, if he does not "smash" the "SO."

57. Defendants are aware, by virtue of their experience and training and history of violent attacks in the SMU, that placing hostile inmates in a cell or recreation cage together creates a sustantial risk that the inmats will engage in violent conduct that can lead to injury or death.

58. Dispite this knowledge, Defendants maintain a practice of intentionally bringing bringing hostile inmates to other inmate's cells as proposed cellmates.

59. Men are rotated to new cells every 21-days. During this ratation, men sometimes receive new cellmates. Men also receive new cellmate assignments if their cellmate leaves the SMU "program" or by some other method.

60. Thus, the possibility ir regularly renewed that all men in th SMU will be placed with a hostile cellmate who poses a substantial risk of harm to men.

61. Double-cell solitary ia a common practice in federal prisons, where more than 80 percent of the men in restrictive housing have a cellmate. But USP Lewisburg presents an added danger of housing some of the Bureau's most volatile prisoners.

62. Many men have suffered violent physical harm at the hands of other inmates in cell and/or recreation cages.

63. Although mant assaults and fights between cellmates in the SMU go unrepoted, according to Federal Incident Report Records obtained by the Marshall Project and National Public Radio (NPR), as of 2016 there had been more than 800 recorded inmate-on-inmate assaults since the SMU opened - a rate six times higher than all federal prisons. And within that time period atleast four men have been killed by their cellmates. See Christie Thompson & Joseph Shapiro, Inside Lewisburg Prison: A Choice Between a Violent Cellmate or Shackles, NPR News Investigation and the Marshall Project (October 26, 2016)

64. Administrative oversight of SMU programs at USP Lewisburg is managed by a Warden and there are Associate Wardens assigned to manage correctional services or custody operations, as well as Associate Wardens responsible for programming. Correctional services is responsible for most of the conditions of confinement an inmate is subjected to, as well as ensuring discipline and order is maintained in the Units. The SMU custody and security is overseen by the facility Captain, and at times by a Deputy Captain.

65. There are a number of Lieutenants assigned to manage the daily operations of the facility, and are tasked with the responsibility of ensuring that all aspects of Policy and Procedure are complied with. These Policies and Procedures include Program Statements, Federal Regulatios, Procedures, and Post Orders.

66. Each shift has an Operations Lieutenant that operates as the shift Commander, and an East and West Lieutenant who manage security operations in a sector of the facility. D and G Units has Lieutenants assigned to those Units on day shift. The East Lieutenant is responsible for B, C, and X Units. The West Lieutenant is responsible for E, F , J, and I Units.

67. Correctional Officers ("C.O.'s") provide correctional services, security, and supervision to the inmates in the SMU. C.O.'s are assigned to a post inside the Housing Units supervising the inmate population on various ranges. The C.O.'s functions and responsibilities consist of maintaining records of inmate activity, conducting periotic wellness checks and rounds, supervising inmate movement, conducting cell moves, and other security-related duties.

68. Unit Management personnel (otherwise known as the "Unit Team"), perform a prominent role in the SMU programs. Unit Managers, Case Managers, and Counselors provide services to the inmate population that includes classification, casework, disciplinary, and programming. Unit Team members work cooperatively with correctional services staff. Particularly, as it relates to celling arrangments of inmates in their Housing Unit.

69. Correctional Officers and Lieutenants report in a parallel chain of command to the facility Captain and/or Deputy Captain. The Captain and/or Deputy Captain reports directly to the Assiciate Warden of Custody Operations, while the Unit Managers report directly to the Associate Warden of Programs.

70. Men frequently inform corrections staff that a placement assignment is inappropriate because the prospective cellmate is hostile to the inmate and poses a substantail risk of material harm to the inmate.

71. These warnings are either ignored by the corrections staff or are directly acknowledged but not acted upon. It is thus a pattern, practice, or policy of

9

corrections staff to force men to accept placement that poses a substantial risk of material harm to the men, and to reserve reassignment until after inmate-on-inmate violence actually takes place.

72. Upon information and belief, Defendants are invlved in the cell and recration cage assignment practices and policies, know the risk of harm posed by these practices, and fail to make any changes to these policies and practices at USP Lewisburg to abate the risk of harm.

## Punitive Use Of Restraints

73. To enforce the pattern or policy of placing hostile inmates together, the Defendants engage in a pattern, practice or policy of punishing inmates who resist dangerous placements by placing them in punitive restraints.

74. These restraints include "Four Point Restraints" (Four-Pointing) and/or "Ambulatory Restraints" along with a "Black Box."

75. "Ambulatory Restraints" are defined by BOP policy as "soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention." U.S. Dept. of Justice, Program Statement 5566.06 CN.-1, Use of Force and Application of Retsraints (hereinafter P.S. 5566.06.

76. At USP Lewisburg, however, "Ambulatory Restraints" are hard restraints and are applied in a manner as to cause severe pain and to prevent the inmate from eating, drinking, toileting, or sleeping.

77. A "Black Box" is another type of restraint. It is a handcuff device, made of a hard plastic material, which attaches to the handcuffs and covers the key hole to prevent inmates from picking the locksof the cuffs. The Black Box is placed over the key-holes of the handcuffs and the chain-link apparatus that runs between the inmate's handcuffs, fusing the left and right handcuff together to make them more restrictive than traditional handcuffs.

78. The Black Box totally restricts all wrist movement. When the Black Box is pulled against the stomach and affixed to the waist-chain the inmate's wrist remains forcibly bent outward in an awkward position that causes pain. This posture causes the handcuffs to cut into the wrist whenever inmates attempt to move their arms.

79. The Black Box was designed, primarily, to ensure safe transport. However, such adevice can cause serious injury if used incorrectly.

80. Four-Point Restarints, otherwise known as "Four-Pointing," involve plaicing

10

an inmate on a bed frame. The inmate's hands are retsrained separately overhead, attached by metal shackles to either the bed frame or the wall behind the bed, while the inmate's limbs are stretched out, and his ability to move is completely restricted.

81. "Hard Retsraints" consist of metal handcuffs, metal shackles, and a metal chain that encircles the body. The metal chain is put around the inmate's waist, and locked onto the inmate by alarge pad-lock that is possitioned at the center of the inmate's lower-back area. The handcuffs, along with the "Black Box" device, are attached to the chain. The handcuffs with the Black Box prevent the inmate from moving his wrist. In addition, the inmate cannot move his hands up or down becuase the handcuffs are attached to the chain. The shackles severely limit an inmate's ability to walk. the possition of the pad-lock prevents inmates from being able to lie flat upon their back, or sleep.

82. Staff at USP Lewisburg do not hesitate to place inmates in restraints as a means to impose ill-will, and for the very purpose of causing inmates pain and suffering. This is particularly so when it comes to inmates who stands to oppose staffs' abuse of authority, for any purpose.

83. According to policy, restraints are only to be used to control an inmate who is a danger to government property, himself, and/or others, and never as punishment.

84. However, staff are required to exersize "confrontation Avoidance" procedures prior to executing any calculated use of force. Pursuant to policy, "The ranking custodial officer (ordinarily the Captain or shift Lieutenant), a designated mental health professional, and others shall confer and gather pertinent information about the inmate and the immediate situation. Based on their assessment of that information, they shall identify a staff member(s) to attempt to obtain that inmate's voluntary cooperation and, using that knowledge they have gained about the inmate and the incident, determine if Use of Force is necessary." P.S. 5566.06, at 7

85. "An Employee may not use brutality, physical violence, or intimidation towards inmates, or use any force beyond that which is reasonably necessary to subdue an inmate." P.S. 5566.06, at 1; 28 C.F.R. 552.23

86. Under BOP Policy, Force, including the Application of Restraints, can be used "only as a last alternative after all other reasonable efforts to resolve a situation have failed." Id.

87. Staff must use "only the amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order." Id.

88. BOP Policy forbids the use of force or restraints to punish inmates and dictates that restraints should only be used "when other effective means to control have failed or are impractical." Id. at 6-7

89. Restraints may not be used "in a manner that causes unnecessary physical pain or extreme discomfort." P.S. 5566.06, at 6; 28 C.F.R. 552.22 (g)(3)

90. At USP Lewisburg Officials regulerly put in restraints inmates who resist accepting a placement with a hostile inmate.

91. Restraints are applied and maintained in an excessively tight manner, causing severe pain, numbness, swollen wrists and fingers, open wounds, breathing problems, and possible nerve damage.

92. The inmate remains restrained for as long as USP Lewisburg Officials choose without any meaningful oversight or process.

93. In addition to causing extreme pain, numbness, and breathing problems, being in hard restraints impacts every aspect of daily life.

94. To eat, an inmate must use the bottom bunk in the cell as a table.

95. Because an inmate in restraints cannot move his hands independently from eachother or away from his body, eating can only be attempted by leaning the whole torso (with hands protruding in front) towards the food tray on the bottom bunk to grab the food, followed by an attempt to get the food into the mouth by stretching the hands upward.

96. Eating causes a great deal of pain because the restraints cut into the inmate's skin, when stretching the hands upwards in attempt to get the food into the mouth.

97. Drinking water from a cup is nearly, if not completely, impossible in restraints, due to the configuration of hands attached to eachother and bound to the waist.

98. Getting water from the metal push-button sinks is similarly difficult and results in being sprayed with water. In the winter time, when the cells are cold because the windows are often intentionally kept open by staff, trying to get water from the sink can have lasting chilling effects.

99. Inmates are unable to maintain their hygiene while in hard restraints.

100. Inmates in restraints are supposed to be offered a bathroom break, which inmates to use a painful process to try move aside their clothing and use the toilet while still in hard restraints.

101. Because of the tight handcuffs and the arrangement of the hands in front of the body, attached to the chain that locks tightly around the waist, it is incrdibly painful to the hands and wrists to try to use the toilet. As a result of

this awkward and painful process, the floor of the cell becomes covered in urine and feces.

102. While inmates are in the cells, the cells are not cleaned and there are no cleaning supplies made available to them.

103. The mattresses are pften plattered with urine and feces due to the inmates inability to toilet while in restraints.

104. The mattresses often have Oleoresin Capsicum ("OC") spray or residue from other chemical weapons on their surface from the manner in which they are handled by officers.

105. Under these conditions, inmates are frequently deprived of sleep.

106. Defendants are aware of the conditions in the restraints rooms, described above.

107. Defendants order or authorize inmates' placement in these conditions, in hard restraints, as part of their program to enforce hostile cell assignments.

108. Inmates have no process by which to challenge the imposition of prolonged and painful periods in restraints. This punishment exists wholly outside of the BOP disciplinary system.

109. As of the date of this complaint, Plaintiff Mack has been unconstitutionally restrained twice in this manner in lation to celling arrangements which Defendants knew presented a risk of substantial harm to Plaintiff's safety, and well-being.

The June 18, 2015 to June 19,2015 Restraint Placement

110. For approximately 24-hours, from June 18, 2015 to June 19, 2015, Defendants kept Plaintiff Mack in hard restraints, which included the use of the "Black Box," in unsanitary and inhumane conditions, as described above, in order to punish him for refusing to accept a dangerous cell assignment.

111. Mr. Mack arrived at USP Lewisburg June 9, 2015 to participate in the SMU Program.

112. When he arrived Unit Team staff conducted a formal intake interview with him in R&D (Receiving and Discharge), at which time he was asked "is there any reason you cannot go to 'GP (general population).'" In response,Mr. Mack informed them that he needed to be placed in Protective Custody becuase of his sex-offender status; the fact that his case involves a minor and that his case is accessable to the inmate population via the prison Law Library on LEXISNEXIS; and because of

having been sent to the SMU from USP Tucson (a known "SO" prison), based on the fact that inmate "prison politics" of the carucasion prison gangs, as well as the "White Independents," in the United States Penitentiaries ("USP's") calls for any white inmates who have come from USP Tucson's population to be "smashed;" which is common knowledge to inmates and staff alike throughout the BOP.

113. Apart from these discussions, the Unit Team staff were in-possession of Mr. Mack's case-file, and reviewed his file during their intake interview.

114. The Unit Team staff assigned Mr. Mack to cell 216, on C-Block, which was unoccupied.

115. C-Block was not a designated housing Unit for "PC" inmates.

116. Cell 216 is the very last cell on the left-hand side of the range, located at the end of the range right next to a doorway that led to an area of which, upon information and belief, was the assigned post of the Use of Force Team Members.

117. Within the first few days of Mr. Mack's arrival to the SMU, without any provocation, the Use of Force Team Members began stopping at Mr. Mack's cell door, while going to and from their post, looking into his cell at him through his cell door window and saying "there's that 'Cho-Mo (child molester)'" loudly on the open range.

118. Mr. Mack ignored them, hoping that they would stop, but it just got worst by the day. The Use of Force Team Members began coming to his cell door several times a day calling him "Cho-Mo" out loud on the open-range for all inmates to hear.

119. The Use of Force Team Members having labeled Mr. Mack a child molester amongst the inmate population provoked inmates to begin sending Mr. Mack death-threats, and would attempt to bait him into going out to the recreation cages so that they could attack him. Because of this, Mr. Mack refused to go to recreation and showers the entire time that he was housed on C-Block.

120. The number of C.O.'s who participated in coming to Mr. Mack's cell together and joining in this misconduct, so openly and freely in such a way, really made Mr. Mack fear for his safety and believe that staff would force him to cell-up with an hostile inmate who they believe would harm him because of his "SO" status.

121. Unsure of what staff he could reach out to for help, amd highly skeptical of what staff to trust, Mr. Mack stopped the prison Chaplain, Mr. B. Carney, during his routine rounds and whispered to him through his cell door to "please help" him, and that his "life was in danger" but that he "could not discuss it on the open range." Chaplain Carney wrote down Mr. Mack's name and number and left.

122. On or about the following day that M.r Mack stopped Chaplain Carney and asked him for help he was pulled out of his cell, escorted to a holding cage in an office area of C-Unit where a staff member, who identified himself as "SIS," came

to speak with him. He informed Mr. Mack that the Chaplain had contacted him and asked Mr. Mack what his problem was. Mr. then informed him of the serious concerns related to his safety, just as he had with the Unit Team at his intake-interview, and further desrcibed what all the Use of Force Team Members had been subjecting him to every since his assignment to C-Block - how they had intentionally labeled him a child molester amongst the inmate population and had provoked inmates to harass and threaten him. He proceeded to ask SIS to place him on PC status, and SIS said that he would look into it.

123. On or about the weekend of Mr. Mack's arrival to the SMU he was reassigned to cell 217 on C-Block, during his range's routine 21-day cell rotation. Cell 217 is the last cell on the right-hand side of the range, located across from cell 216.

124. On or about June 15, 2015, a Lt., along with about five C.O.'s in tandem, arrived at Mr. Mack's cell door. Two of the C.O.'s stood at both sides of an inmate, Timothy Chapek BOP Reg. No. 74720-065, whom they had physically restrained. Mr. Chapek stood there barefooted, in restraints and paper cloths. The Lt. opened Mr. Mack's foot slot and ordered him to "cuff-up." Mr. Mack was cuffed-up and ordered to stand at the back of his cell, at which time they opened the cell door and placed Mr. Chapek into the cell with Mr. Mack.

125. The first thing that Mr. Mack observed about Mr. Chapek was the wounds around his wrists and ankles, which were caused by being placed in excessively tight restraints. Mr. Chapek informed Mr. Mack that he had been placed in restraints for two days after he was assaulted by his cellmate and then refused to go into the cell with an inmate who staff attempted to force him to live with.

126. On or about the morning of June 18, 2015, Mr. Mack was taken to his "Quay" review. A couple of Unit Staff were present at his "Quay" review along with Special Investigative Agent "SIA" Heath. Mr. Mack informed them all of his concerns for his safety, just as he had with the Unit Team staff at his intake interview and the SIS staff member who he had met with. The Unit Team staff seemed to ignore Mr. Mack's safety concerns while SIA Heath responded by calling Mr. Mack a "piece of shit" and told him that he is "in for a rude awakening here at Lewisburg." A few minutes later Pschologist Eigenbrode entered the room and spoke with Mr. Mack. He then expressed those same safety concerns with Dr. Eigenbrode.

127. SIA Heath was in charge of Special Investigative Services (SIS). SIS staff plays a central role in the classification of inmates to Protective Custody status, and in assisting facility supervisors in the management of the inmate population. SIS has to approve cell assignments of most inmates on PC status.

15

128. On June 18,2015, at around 10:00 A.M., ar several members of the Use of Force Team walked down the range past Mr. Mack's cell, one of them, C.O. Kemmerer, announced loudly on the range, so that all inmates on the range would hear, "there's the 'Cho-Mo' in cell 217...come here lil-boy i've got a pocket full of candy." This caused Mr. Mack's cellmate to ask him "what was that all about?" and to further question him about what C.O. Kemmerer had said. It also caused other inmates on the range to yell threats at Mr. Mack and call him a"Cho-Mo."

129. This left Mr. Mack in complete fear for his safety. And he had to quickly ensure his cellmate that he was going to force staff to move him in order to prevent his cellmate from possbly attacking him.

130. Shortly thereafter, when the rang officer came around collecting inmate's lunch trays Mr. mack notified the officer that there was an emergency and he needed to see a Lt., and that he was going to hold his food trays until he was able to see a Lt..

131. Approximately thirty minutes later a Lt., who was carrying a backpack and a rapid-fire pepper-ball gun, arrived at Mr. Mack's cell door and demanded that he give-up the food trays. Mr. Mack explained the situton and asked to be moved off of the range. The Lt.told Mr. Mack theat he would not be moved and that he was going in restraints for holding his food trays. He then walked away and went into the area of the Use of Force Team's post.

132. About 5-10 minutes later, officer Kemmerer came to Mr. Mack's cell door, from the Use of Force Members post, and began, boldly, telling Mr. Mack that he was a 'cho-mo' and that he had "the paperwork back there" (and pointed towards the Use of Force Members post), infront of his cellmate and all of the inmates on the reange

133. Sometime around 12:00 A.M. about six Use of Force Team Members, presumably officer Kemmererand the same officers who had labeled Mr. Mack a child molester and had been harassing him since being housed on C-Block, arrived at Mr. Mack's cell all dressed in full riot gear. They were led by a Lt., who carried the above described gun, and had a camera-man in toll. the Lt. who commanded the Team ordered Mr. Mack to "submit to hand restraints," to which he coplied.

134. Mr Mack was then taken out of his cell without incident and escorted down the range by the Use of Force Team. He was escorted forcibly hunched over at a 90° angle with his head held waist-high, face down, and forced to walk backwards.

135. While being escorted off of the range, one of the Use of Force Team Members, who had hold of Mr. Mack's head, tried to provoke Mr. Mack to "resist" by shoving his "OC" (oleoresin capsium) spray. laced gloved fingers into Mr. Mack's eyes,gouging his eyes and causing them to burn really badly.

136. At the end of the range, as commanded by the Lt., The Use of Force Team stripped Mr. Mack's clothes off of him, scanned his nude body with a hand-held metal detector, and placed him in paper cloths and hard "ambulatory" restraints - steel handcuffs, "Black Box," waist chain, and leg irons. The restraints were placed on Mr. Mack excessively tight.

137. While being placed in paper cloths and restraints, the Use of Force Team Members who had hold of Mr. Mack's hands behind his back made further attempts to provoke Mr. Mack to "resist" by bending his wrists so far upwards that he feared they were trying to break his wrists. And although this caused Mr. Mack to endure excruciating pain, he feared what the Use of Force Team would do to him if he were to jerk or react in the slightest way.

138. Do to the fact that the staff member who operates the hand-held video camera during the Use of Force and Applicationof Restaraints incident always tails the Use of Force Team Members (usually six members) and Lieutenant(s), and the inmate is always possitioned at the very front of the pack, bent over and surrounded by Use of Force Team Members who are suited-up in padded body gear and maintain a tight formation around the inmate, the inmate remains shielded from the view of the video camera by the Use of Force Team Members and Lt.'s during escort and much of the Use of Force and Application of Restraints process. This allows the Use of Force Team Members to assault and abuse inmates out of view of the video camera, within their very own shaddows.

139. The Use of Force Team escorted Mr. Mack to D-Block, where he was left in restraints and locked within cell 101, in the cell conditions described above.

140. The cell was without any running water in the sink.

141. Under BOP Policy, staff must regulerly check on the placement of an inmate's restraints. The Lt. is also supposed to determine whether the inmate should remain in restraints or whether he should be released.

142. The inmate's health is also suppose to be checked during a "restraint check." At USP Lewisburg, however, medical and custody staff routinely ignore inmate's complaints of pain and other medical problems caused by tight restraints.

143. Every time checks were conducted Mr. Mack told each Lt. present that the restraints were too tight and causing him severe pain. He would plead with them to loosen the restraints.

144. All of these staff routinely denied these requests, causing Mr. Mack to remain in extremely painful restraints.

145. The Lt.'s had the authority to release Mr. Mack from restraints. they were aware of his complaints of pain and were aware that he was not threatening harm or

taking any othe r actions that would justify restraints.

146. Despite this  knowledge, the Lt.'s refused to release Mr. Mack from restraints and ignored his pleas for help.

147. During the restraints "restraint checks," Mr. Mack also told medical staff that the restraints were too tight and that he needed medical attention. However, a Lt. is required to be present during the medical checks, and the medical staff deferred to the Lt.'s to determine whether the inmate needed medical attention and whether the restraints were too tight.

148. Instead of responding to the complaints of pain caused by the restraints, when Mr. Mack asked medical staff for medical attention, treatment, and relief, medical staff just ignored Mr. Mack.

149. Medical staff also falsely recorded these interactions in Mr. Mack's medical records.

150. At some point during the restraint period, the tightness of the restraints cutt off Mr. Mack's circulation to his hands.

151. As aresult of the unnecessary tight restraints, Mr. Mack suffered intense pain, swelling, pressure sores, abrasions, cuts, numbness, and other injuries.

152. Mr. Mack was in hard "ambulatory" restyraints for approximately 24 hours.

153. While in restraints Mr. Mack was unable to eat or drink anything, use the toilet, or sleep th entire time.

154. Defendants kept Mr. Mack in restraints in conditions amounting to torture, as described above, from June 18,2015, to June 19,2015.

155. As was the case with Mr. Mack, many other inmates were put into restraints for refusing hostile celling arrangements.

156. Defendants applied hard "ambulatory" restraints to Mr. Mack for no legitimate reason, causing extreme pain and injuries, as described above.

157. Just before Mr. Mack was released from restraints, on June 19, 2015, a Unit Team Member and a Lt. entered the cell with Mr. Mack to conduct a (UDC) hearing for the incident report he received in relation to being placed in restraints. The Team Member who conducted the hearing informed Mr. Mack that he had been charged with offense code 203, for threatening staff. Whwn Mr. Mack responded that hedid not threaten anyone, the Lt. who was present laughed and told Mr. Mack that whenever someone gets placed in restraints that they get a "203" too.

158. There were no surveillance camera in the restraint cell which Mr. Mack was placed in. There were no surveillance camera which recorded the view of the inside of the restraint cell Mr. Mack was placed in. And at no time did any staff member

videotape any of the "restraint checks," or when staff members entered into the cell with Mr. Mack while he was in restraints.

159. Mr. Chapek has provided Mr. Mack with a Declaration, signed under the penalty of perjury, verifying Mr. Mack's account of what had led up to his placement in restraints.

### The G-Block Terror Squad

160. The Defendants have adopted a pattern, practice or policy of having "problematic" inmates - inmates who file complaints or speak out against staffs' abuse of inmates and constitutional misconduct, inmates who staff believes needs to be more closely "monitored," and inmates who receive incident reports-assigned to G-Block housing unit to be subjected to ongoing daily harassment, intimidation, and threats by G-Block Officers, and the threat of being assaulted by G-Block Officers.

161. USP Lewisburg was established in 1932. Many staff who are currently employed at USP Lewisburg have relatives and family members who are employed by their side today at USP Lewisburg, and/or have relatives and family members who had been employed With USP Lewisburg for several generations.

162. Staff's family ties, long-lasting for many, to USP Lewisburg and solid friendships developed with other staff members over the course of years of working side-by-side with their "us against them (staff against inmates)" mentality has cultivated a "Brotherhood" bond between staff who maintains a strict code of silence with respect to inmate abuse and staff misconduct.

163. USP Lewisburg's Warden, Defendant Ebbert, has deep roots to that "Brotherhood" himself, having been employed at USP Lewisburg, as a guard, over 18-years ago.

164. Because of this, USP Lewisburg prison officials and officers have been able to terrorize and abuse inmates at will with impunity, and have become infamous over the years for incidents of rampant abuse and vindictive harassment. Such incidents have been part of a widespread, culture of corruption at USP Lewisburg.

165. USP Lewisburg officers and officials have been able to foster and then conceal this corrupt culture by abusing inmates off camera, by, upon information and belief, failing to preserve cell-block surveillance camera videotape footage for any longer than about 10-days, by deliberately fabricating records, by maintaining a code of silence to stymie investigations into inmate abuse and staff misconduct, and by the Prison Administration's indifference.

166. The Administration at USP Lewisburg enables, if not encourages, its Corrections Officers to engage with impunity in calculated challenges to inmates' Constitutional protections.

167. Corrections Officers routinely uses unconstitutional brutality, threats, and harassment against inmates at USP Lewisburg to create an atmosphere of fear for inmates.

168. USP Lewisburg lacks the sufficient amount of video surveillance cameras throughout the prison that is needed to be able to fully monitor staffs' interactions with inmates.

169. There are many areas within the housing units, and throughout the prison, where there are no video surveillance cameras. these areas are known as "blind-spots!"

170. Whenever inmates are escorted anywhere in the prison they are forced to walk through various "blind-spots" along their path. And while conscious of where there are no video cameras, C.O.'s at USP Lewisburg are well aware of where their "blind-spots" are located.

172. In general population of other USP's and high security prisons throughout the United States "blind-spots" throughout prisons are a serious safety concern to prison Administration Officials because prisoners are known to seek out and use "blind-spots" as an area to stage an attack on others. The wide-spread recognition of this serious safety concern has compelled prison Administration Officials throughout the United States to up-grade their video surveillance systems and install surveillance cameras in all "blind-spots" in their prisons.

173. Correction Officers at USP Lewisburg have engaged in a pattern of taking inmates to "blind-spots" in the prison and abusing them for many years now to spread fear and terror throughout the inmate population. And, in many cases, falsely charging those inmates for assault on staff or of "resisting," after they are beaten, to cover-up their assaults or to justify their injuries to inmates.

174. All inmates in the SMU are transported in restaraints whenever they leave their cells. USP Lewisburg requires that inmates be handcuffed from behind, with palms out and thumbs up, throught the food slot before the cell door is opened to remove the inmate. The handcuffsare double locked, to prevent the inmate from tampering withthe handcuffs. Inmates are also scanned with a hand-held metal detector and pat searched prior to any movement taking place.

175. The inmate may be transported by a single officer. In cases which dictates the need for more supervision of inmates movement, additional precautions can be taken. These include the following:

    \* Two Man Hold: The two-man hold is one method utilized by the BOP. The two-man hold requires that two staff be present the entire time the inmate is out of his cell or secure area. This requires one staff member will remain in direct physical contact with the inmate at all times and both staff members are directly responsible for the control of the inmate.

    \* Three-Man Hold: In a three-man hold situation, two stff members remain in direct physical contact with the inmate at all times, and all three staff are directly responsible for the control of the inmate.

    \* Lieutenant Hold: The Lieutenant hold technique calls for a Lt. to be present the entire time the inmate is out of the cell and the Lt. is required to provide supervisory oversight during the inmate movement.

176. Given the fact that inmates are always handcuffed behind their backs and subdued by staff anytime that they are out of their cells, inmates are defenseless to attack and must depend on staff to protect them.

177. Corrections Officers at USP Lewisburg are also engaged in a pattern of assaulting and torturing inmates who are placed in restraints, within the restraint cells where there are no video surveillance cameras.

178. Upon information and belief, cell-block videotape footage, from the Housing Unit's video surveillance cameras, at USP Lewisburg, is only preserved for about 10-days. Which makes it nearly impossible for inmates to proceed to go about having the prison Administration to preserve cell-block videotape footage of inmate abuse and Constitutional misconduct for future judicial review.

179. Many G-Block inmates never come out of their cells to go to the shower or recreation because of their fear of what G-Block officers will do to them.

180. Under these circumstances USP Lewisburg Officials and Officers have cultivated and continue to foster a corrupt culture of staff who brutalizes and terrorizes inmates with impunity, and forces the inmate population to live in an atmosphere of fear.


### Mr. Mack Is Reassigned To G-Block Housing Unit


181. Despite Mr. Mack's Protective Custody status and need of being housed separately from general population inmates in the SMU, on February 15, 2017, correctional staff moved him off of the "PC" Block, X-Block, and reassigned him to G-Block Housing Unit, as a result of an incident report he received.

182. On February 16, 2017, shortly after 10:00 A.M., G-Block Officers Sheesley,

Finck, Chappell, and Savidge arrived to Mr. Mack's cell door and ordered him to "cuff-up" for a cell "shake-down."

183. Approximately 30-45 minutes later C.O. Finck came back to the shower area to escort Mr. Mack back to his cell. Officer Finck escorted him out of the shower area and into the gated sally-port area, which connects to the entrance of his range, where Officers Sheesley and Chappell both stood posted-up on both sides of the walk-way near the entrance to his range. As Officer Finck escorted Mr. Mack between Officers Sheesley and Chappell, without any provocation, Officers Sheesley and Chappell both lunged at Mr. Mack simultaneously and began to violently attack him. As though acting on cue, Officer Finck immediately threw Mr. Mack to the floor and all three Officers kicked and punched Mr. Mack in the face, head, and all over his body as he layed there handcuffed behind his back, defenseless.

184. Mr. Mack screamed loudly as he was gratuitously beaten. And the Officers kept yelling at him, "shut-up 'cho-mo,'" as they pummelled him.

185. After being brutally for about two minutes, or so, the Officers stood Mr. Mack up and whisked him onto the range and into his cell.

186. The C.O.'s committed this assault in one of the prison's "blind-spots." An area of which G-Block C.O.'s are known to assault inmates.

187. Several inmates, who were housed in cells next to the range's entrance by where Mr. Mack was assaulted, had witnessed the assault. While many other inmates on his range heard Mr. Mack's screams and the pummeling of him and the C.O.'s calling him a "cho-mo."

188. The C.O.'s tore up Mr. Mack's entire cell, leaving his legal work all mixed up and scattered everywhere, as well as his personal property. Important legal work was confiscated and thrown away, including his criminal appeal and exhibits, a file folder labeled "LEGAL WORK, Lewisburg Restraints," Grievances, and ect. The C.O.'s ripped pages out of his law books. Personal property, including postage stamps and family photos were taken. Other family photos were left upon Mr. Mack's bed ripped up.

189. The C.O.'s wrote "cho-mo" on Mr. Mack's cell wall. They also wrote "HOW MUCH" with an arrow pointing at a little boy in a USA TODAY newspaper article, which Mr. Mack had saved because the article is about him hometown of Lorain, Ohio.

190. As Officer Finck secured Mr. Mack in his cell Mr. Mack told him that he needed to see a Lt. and someone from medical. Officer Finck told Mr. Mack that he would not be seeing anyone.

191. Because Mr. Mack feared that G-Block Officers would continue to assault

him at will if he was prevented from reporting the assault and getting it properly documented so that it could be fully investigated, he covered up his cell door window with paper until a Lt. would come to his cell so that he could report the assault.

192. The G-Block Officers, on the shift which the assault occurred, refused to draw attention to Mr. Mack's cell, and thus, went about the remainder of their shift ignoring his window being covered up. Shortly after their shift changed Officer Lamont dispated the Lt. to Mr. Mack's cell.

193. At around 3:00 P.M. Lt.'s Scott and Casper, and Officers Lamont and Chadderton arrived to Mr. Mack's cell door. At which time he uncovered his cell door window and reported the assault to them.

194. Lt. Scott asked Mr. Mack why he had his window covered. In response, Mr. Mack showed the Lt.'s his injuries from the assault and said that he needed to report that he was assaulted by staff and to see medical staff.

195. Lt. Scott told Mr. Mack to "cuff-up" and that he would have medical staff conduct a medical assessment of his injuries. Mr. Mack cuffed-up and was escorted to an up-stairs holding cage.

196. When Mr. Mack was secured in the holding cage Lt. Scott asked him which C.O.'s assaulted him, where the assault occurred, and when did it occur. Mr. Mack told the Lt. that he did not know the C.O.'s names who assaulted him, but that they were the C.O.'s who had pulled him out of his cell for a "shake-down," and that they jumped on him and assaulted him outside of the shower area inside the gated sally-port area when being escorted from the shower area back to his cell after their 10:00 A.M. cell "shake-down."

197. The Lt.'s left and then returned back to the holding cage about five minutes later with Nurse Matthew Fahringer and a digital camera. Lt. Casper took several pictures of Mr. Mack's injuries to his face, head, and body, as Nurse Fahringer scanned his upper-body and wrote notes of his visable injuries.

198. In attempt to notify the Warden, Defendant Ebbert, of the assault, as soon as possible, Mr. Mack wrote a letter to the Warden explaining how he was assaulted, and a letter to Paralegal David Sprout at Lewisburg Prison Project requesting that Mr. Sprout fax Warden Ebbert Mr. Mack's letter to the Warden on his behalf. But because of the problems that Mr. Mack had been having with Staff throwing away his mail since being in the SMU, he asked inmate Kenneth Johnson, BOP Reg. No. 44665-007 who had witnessed the assault, if he would mail out Mr. Mack's letters to Mr. Sprout and Warden Ebbert to Lewisburg Prison Project as "Legal Mail" for him.

199. Mr. Johnson volunteered to do so and Mr. Mack gave him those , above described letters along with a stampted envelope already addressed to "Attorney Angus Love, Lewisburg Prison Project, P.O. Box 128, Lewisburg PA. 17837" with the front of the envelope properly marked as "LEGAL MAIL," to mail out those letters.

200. Mr. Mack instructed Mr. Johnson to be sure to seal-up the envelope in the presence of the C.O. he gives it to, so that they would not be able to read the letters. Later that evening Mr. Johnson informed Mr. Mack that he had sealed-up those letters in the presence of the range Officer and submitted it to him to mail .

201. Mr. Mack had, in fact, witness Mr. Johnson seal-up and submit those letters to C.O. Chadderton, and the C.O. place his initials on the envelope, which is the practice of staff who collect legal mail that is sealed by the inmate in their presence.

202. At around 7:40 P.M. Mr. Mack submitted a sealed envelope, with SIS written big on the envelope, with an Inmate Request to SIS enclosed, to C.O. Chadderton. Mr. Mack sent SIS this Inmate Request to inform SIS of the assault and to request that the matter be referred to the BOP's Bureau of Internal Affairs, pursuant to policy and the Code of Federal Regulations, to ensure an outside investigation.

203. From the day of the assault on Mr. Mack all the way up until he was finally moved back to X-Block, about four moths later, G-Block Officers Sheesley, Finck, Chappell, Sullivan, Beaver, Moyer, and others, collectively, terrorized Mr. Mack and forced him to live in a constant state of fear by subjecting him to ongoing daily threats and harassment. Among other things, these officers would come to Mr. Mack's cell door everyday calling him a "cho-mo" loudly on the open range and threaten to kill him and tell him he needs to kill himself "like Johnson, except do it right...."

   Mr. Kenneth Johnson had attempted to commit suicide by hanging himself because of Officer Sheesley and other G-Block Officers constant harassment and retaliation against him in relation to attempting to send Mr. Mack's legal letters to Paralegal David Sprout at LPP.

204. Officer Sheesley told Mr. Mack that he'de be lucky to make it out of Lewisburg alive and that he will learn the hard way that filing paperwork won't get him anywhere and only makes it worst on him. He also threatened to shove a broom stick up hiss "ass" into his guts, and to break his neck, and said that he would probably receive a promotion for doing so.

   Mr. Mack was known to staff as a Jailhouse Lawyer who helps inmates file grievances and with other legal issues.

205. Officer Sullivan would repeatedly threaten to "accidently" place an inmate into the cell with Mr. Mack "who would love to kill a 'cho-mo,'" on a reguler basis,

and torment him with vivid descriptions of how he would be raped, tortured, and killed by who they place into the cell with him.

206. Mr. Mack had heard many of the horror stories related to G-Block Officers infamous reputation of beating and terrorizing G-Block inmates for many years. These Officers campaign of terror against Mr. Mack inflicked severe psychological torture which made everyday for him extremely difficult to cope. And he had to struggle with suicidal feelings and thoughts which made him feel that he'de be better off killing himself than to have to continue to deal with G-Block Officers campaign of terror. Mr. Mack struggled with suicidal feelings and thoughts nearly daily while housed in G-Block.

207. On February 17,2017, at around 12:45 A.M., Mr. Mack stopped Captain RHodes at his cell door, as the Captain made his routine rounds on his range, at which time he informed the Captain that he had been assaulted by three C.O.'s the previous day and pointed behind the Captain at C.O. Chappell, who was one of the officers that was standing behind him escorting him through G-Block, and told the Captain, "thats one of the C.O.'s who assaulted me right ther." The Captain refused to turn around to acknowledge who the officer was that Mr. Mack alleged to of assaulted him. And as he proceeded to show the Captain his two black-eyes, that he had woke up with , as well as the other bruises all over his body, the Captain looked him up and down and said "I don't see anything," and walked off.

208. The Captain's refusal to acknowledge his Officer's assault on Mr. Mack, as well as his total lack of concern for his safety induced great fear within Mr. Mack.

209. In fear that his safety and life was in danger, and desperate to obtain help from the Prison Administration, Mr. Mack submitted an "EMERGENCY REQUEST" to Chaplain Leininger on February 17, 2017, at around 4:00 P.M., during the Chaplain's routine rounds on his range, which described the assault, ongoing harassment and threats to him by G-Block Officers, requesting that the Chaplain e-mail his "EMERGENCY REQUEST" to Associate Warden Jusino.

210. On February 18, 2017, at around 11:30 A.M., Mr. Mack observed Officers Sheesley, Finck, Chappell, Beaver, and Moyer - The G-Block Terror Squad - go to inmate Johnson's cell door, which was located directly across the range from his cell. They ordered Mr. Johnson and his cellmate, Stacy Butler, BOP Reg. No. 05373-017, to cuff-up for a cell "shake-down." They were both cuffed-up, extracted from their cell, and escorted off of the range without incident.

211. Mr. Mack watched as the C.O.'s tore their cell up and left with a large see-through garbage bag full, with what appeared to be a lot of paperwork and

personal property that was taken from Mr. Johnson and Mr. Butler's cell.

212. Once they were placed back in their cell one of the C.O.'s yelled out loudly for all inmates to hear, "Attention on the range, cell 305 likes to hang out with and do legal work for 'cho-mos.'"

Mr.Johnson and Mr. Butler's cell number was "305."

213. Shortly after they returned to their cell, Mr. Butler and Mr. Johnson informed Mr. Mack that they were told by the C.O.'s that they were targetted because SIS had got the Legal Mail that Mr. Johnson submitted to staff as "LEGAL MAIL" to be mailed to LPP on Mr. Mack's behalf.

214. Mr. Sprout did, in fact, confirm to Mr. Mack that LPP had never received the above described letters which Mr. Johnson submitted to staff as "LEGAL MAIL" to be mailed to LPP on Mr. Mack's behalf.

215. On February 21, 2017, a memorandum, signed by Defendants Ebbert, Kazuba, and Rhodes was posted next to Mr. Mack's cell door requiring: (1) A Lieutenant to be present  whenever Mr. Mack is escorted outside his cell; (2) two Officers to accompany a Lt. during escort; and (3) Mr. Mack to be double-cuffed - for two pairs of handcuffs to be placed on Mr. Mack's wrists when removed from his cell.

216. On February 22, 2017, Mr. Mack was given a hearing by the Disciplinary Hearing Officer (DHO) for the incident report he was issued for having covered his cell door window, on 2/16/17, after he was assaulted by G-Block C.O.'s. When the DHO asked him why he covered his window he stated that he was assaulted by staff and needed to see the Lt. and medical. However, DHO, A. Jordan, failed/refused to document Mr. Mack's allegation of having been assauled "by staff," and only documented the part of his statement about needing to see medical.

217. Mr. Mack's sole intention for appearing at his DHO hearing (many inmates decline to appear for their DHO hearing when asked by staff if they "want to go to DHO") wasn't to dispute whether or not he was guilty of covering his window, but instaed was a calculated effort made to place on record his allegation of being assaulted by staff in order to trigger DHO's duty to report his allegation of being assaulted by staff to the prison's Administration. And it would be naive to believe that DHO wouldn't have conducted its "fact finding" inquiry with respect for the reason why Mr. Mack covered his window, or that Mr. Mack would not have reported to the DHO that he was assaulted by staff.

218. Among the sanctions imposed by DHO, Mr. Mack was sanctioned to loss of mattress for one month.

219. Inmates who are sanctioned to loss of mattress are pulled out of their

cell every morning at around 7:00 A.M. by cell block Officers, who then goes into the inmate's cell and takes the mattress. The mattresses are then returned to the inmates at around 10:00 P.M..

220. In many cases G-Block Officers take advantage of this DHO sanction by using it as an oppertunity to pull inmates, who are the targets of harassment by G-Block Officers, out of their cell first thing every morning to go into their cell and tear their cells up, and to throw away the inmate's personal property, while the inmate is forced to stand right there and except it.

221. As in the case of Mr. Mack, several G-Block Officers would arrive to his cell early every morning, including Defendants Sheesley, Finck, Chappell, Sullivan, Beaver, Moyer, and Hackenburg, squeeze two pairs of handcuffs around both of his wrists as tight as they could squeeze them to cause pain and attempt to provoke any sort of reaction which would allow them to pounce upon him and harm him, then proceed to back him out of his cell onto the range where he would have to stand there restrained by by an Officer or two who stands there assaulting Mr. Mack with a non-stop stream of venomous slurs and threats while two or three other C.O.'s go into his cell throw away his personal property and trash his cell in front of him before exiting with his mattress. All of the above named G-Block Officers participated in this constitutional misconduct.

222. These G-Glock Officers routinely misconducted themselves freely in this manner in the presence of Lt.'s Beachel and Kemmerer, who had both ignored Mr. Mack's complaints of these Officers vindictive misconduct.

223. In an attempt to stop the C.O.'s from comingto his cell every morning to "get his mattress" Mr. Mack told the evening shift senior Officer to keep his mattress and that he didn't want a mattress anymore. The Officer informed him that inmates were no longer permitted to refuse their mattress and that they write incident reports for everyday that an inmate refuses his mattress. Mr. Mack understood then that the G-Block C.O.'s would stop at nothing to continue to do what they were doing.

224. On February 25, 2017, Mr. Mack received a visit from his volunteer visitor Carol, with Prisoner Visitation Services (PVS) Organization. During his visit he explained to her how the G-Block C.O.'s assaulted him and how he was in fear for his life and begged her to contact Mr. Sprout at LPP and inform him of what happened and that staff was intercepting his mail so he was unable to get a letter to him, and to tell Mr. Sprout to come visit him as soon as possible. Carol was very disturbed by what Mr. Mack revealed to her as well as other similar things which she had been

27

hearing about staff's abuse of inmates at USP Lewisburg. She told Mr. Mack that she would contact her coordinator at PVS and see what she could do. About two weeks later Mr. Mack received a post card from Carol informing him that she would no longer be a visitor at USP Lewisburg.

225. Upon returning back to his cell, in the escort of Lt. Kemmerer, Mr. Mack discovered his cell torn-up and completely trashed. When Mr. Mack complained to Lt. Kemmerer about what the G-Block Officers had done to his cell and personal the Lt. responded by stating "welcome to G-Block."

226. Mr. Mack's personal property, including his legal work, was thrown all over his cell. His bottles of fragrance oil, which he purchased from commissary, were pored all over his legal work and mail from his family. His wash cloth and drinking cup was thrown into his toilet. All of his writing were confiscated, as well as more of his legal work, which included his "Records Of Correspondance," and "EMERGENCY INMATE REQUEST" to Dr. Enigk of pschology describing staff's assault on Mr. Mack and the symptoms of his mental suffering.

227. Mr. Johnson and Mr. Butler informed Mr. Mack that they witnessed all of the G-Block Officers go into his cell, tear his cell up and take his property while he was on his visit with Carol.

228. Mr. Mack asked Officer Sheesley to please give him back all of his legal work that was taken out of his cell and why they keep harassing him when he doesn't never say anything to them or bother them at all. Officer Sheesley responded by telling Mr. Mack that he doesn't "have nothing coming" and that "its just begun 'cho-mo' we've got a grave for you out back."

229. The G-Block Officers who were on shift during Mr. Mack's visit were Sheesley, Chappell, Fick, Beaver, Sullivan, and Moyer.

230. On February 26, 2017, G-Block Officers conducted their routine tri-weekly cell-rotation of inmates on Mr. Mack's range.

231. The cell block's "number one" officer usually coordinates and oversees the cell-rotation of inmates on their cell block.

232. During cell-rotation Officer Sullivan, G-Block's "number one" officer, skipped Mr. Mack out of rotation from cell 323 to cell 326, the first cell on the range.

233. Mr. Mack was told by other inmates that cell 326 was out of view of the range's surveillance camera.

234. On February 26, 2017, Mr. Mack sealed-up two separate Legal Letters in envelopes, which were properly marked as "LEGAL MAIL" and had the appropriate postage, in the presence of his evening shift range officer and submitted them to

him to be mailed. One of those letters was addressed to: Regional Director, Northeast Regional Office, Federal Bureau of Prisons, U.S. Customs House - Seventh Floor, Second and Chestnut Streets, Philadelphia, PA. 19106, in which he sent the Regional Director an "EMERGENCY GRIEVANCE" informing the Regional Director of the G-Block Officers assault on him and their ongoing threats and harassment, seeking the Regional Director's help. Mr. Mack's other letter was addressed to: Attorney Angus Love, Lewisburg Prison Project, P.O. Box 128, Lewisburg, PA. 17837, in which he sent Mr. Spout a letter captioned "URGENT" informing Mr. Sprout about the G-Block Officers assault on him and their ongoing threats and harassment, seeking LPP's help

235. Mr. Mack has since confirmed, through Mr. Sprout, that LPP had never received the above mentioned letter from Mr. Mack.

236. And while the Regional Office always provides inmates with a receipt of their Emergency/Sensitive Grievances, Mr. Mack never received any receipt or response to his "EMERGENCY GRIEVANCE" - Legal Mail - from the Regional Director.

236. Early in the morning on February 27, 2017, Officer Sullivan arrived to Mr. Mack's cell to "take his mattress." When he placed his hands out of his door's food slot to submit to hand-restraints Officer Sullivan squeezed two pairs of handcuffs as tight as he could into Mr. Mack's wrists and told him "you know your off camera now (referring to how the area of Mr. Mack's cell, where they moved him out of cell-rotation to, was out of veiw of the range's surveillance camera), if we can find a way to kill you we will." Officer Sullivan proceeded to pull Mr. Mack out of his cell, where on the open-range he repeatedly called Mr. Mack "cho-Mo" in front of the inmates on the range. Mr. Mack told Officer Sullivan that they were going to have to answer to the courts. Officer Sullivan smiled at him and said,"we're the Government, we,ve got the best Lawyers." Mr. Mack was placed back in his cell after the other G-Block Officers tore his cell up and took his mattress on the way out.

237. On February 27, 2017, at around 12:30 A.M., as Captain Rhodes conducted his routine rounds on Mr. Mack's range, Mr. Mack slid the Captain an envelope which contained a letter to the Captain describing how the G-Block Officers, who assauled him andothers G-Block Officers, had been threatening and harassing him daily since the assault on February 16, 2017.

238. About twenty minutes later Officer Sullivan (whom Mr. Mack had complained about in his letter to the Captain) and an Officer who kept a spiked "mo-hawk" hair cut (believed to be Officer Hackenburg) arrived to Mr. Mack's cell door with the envelope and letter which Mr. Mack had just given to the Captain. Officer Sullivan held the letterup to Mr. Mack's cell door window and ripped it up in his face and

said, "see, the Captain don't like 'cho-mos' either," and proceeded to both lodge a barrage of slurs and threats at Mr. Mack.

239. On February 28, 2017, at around 9:00 A.M., Mr. Mack was finally able to submit his Informal Resolution Attempt/Grievance to G-Block Counselor Diltz, describing how he was assaulted by staff in a "blind-spot" and how G-Block Officers, including the Officers who assaulted who assaulted him, was subjecting him to ongoing daily harassment and threats. Mr. Mack also complained about how Officer Sullivan had told Mr. Mack that he is "off camera now, if we can find a way to kill you we will," after being moved into cell 326.

240. On March 2, 2017, Deputy Captain Konkle responded to Mr. Mack's Informal Resolution Attempt, informing Mr. Mack that "an invetsigation into [his] allegations is being conducted."

241. Desperate for help in this matter, Mr. Mack decided to contact the Office of the Inspector General (OIG) and notify them as to how the G-Block Officrs were routinely beating and terrorizing inmates at USP Lewisburg.

242. So, on March 9, 2017, Mr. Mack submitted a "LEGAL LETTER," addressed to LPP, to G-Block case manager, Klosner, the "LEGAL LETTER" included a letter to Mr. Sprout, and a Complaint addressed to the OIG along with an attached 6-page Declaration made by Mr. Mack. In his letter to Mr. Sprout he requested that Mr. Sprout send his Complaint and 6-page Declaration to the OIG on his behalf.

243. Mr Mack received a response back from Mr. Sprout informing him that he had sent Mr. Mack's letter and Declaration to the OIG, and also sent Mr. Mack a copy of a letter which he had written to the OIG and sent it along with Mr. Mack's letter and Declaration.

244. From March 9th through March 10th, 2017, two maintenance staff installed a video surveillance camera in the gated sally-port area, "blind-spot," where Mr. Mack was assaulted on February 16, 2017, by G-Block Officers. They also replaced the one, and only, surveillance camera on Mr. Mack's range with a different type of model, wide-lens, video surveillance camera. Mr. Mack watched the maintenance staff plug the newly installed range's video surveillance camera into a portable laptop device to adjust the camera's view of the range when they mounted the camera into possition to, upon information and belief, bring Mr. Mack's cell, cell 326, within view of the camera.

245. Mr. Mack proceeded to file an Administrative Remedy Request (formal Grievance) to the Warden informing him that Mr. Mack had been assaulted by G-Block Officers and that he was being subjected to ongoing daily harassment and threats by

G-Block Officers. Among other things, Mr. Mack requested that the Warden refer the matter for an Independant Investigation, install video surveillance cameras in all "blind-spots" of the prison, "including isolation cells which are used for inmates who are placed in restraints," and for all G-Block videotape footage, for the entire day of February 16, 2017, to be fully preserved for judicial review.

246. On Mach 21, 2017, Defendant Ebbert responded to Mr. Mack's Administrative Remedy Request, informing Mr. Mack that his "allegations were referred to the proper authority and an investigation into [his] allegations is being conducted."

247. As the G-Block Officers continued their ongoing daily harassment, threats of violence, tormenting, and terrorizing of Mr. Mack he asked Mr. Sprout if he would contact the Warden on his behalf and ask the Warden to move him off of G-Block away from the G-Block Officers who assaulted him and are terrorizing him.

248. On April 3, 2017, Mr. Sprout mailed a letter to the Warden, Defendant Ebbert, on behalf of Mr. Mack, informing him that Mr. Mack "has received constant harassment, retaliation and unprofessional treatment from some staff members who work on G-Block" including the Officers who "assaulted him on February 16th" requesting he be moved off G-Block and "away from the staff members who assaulted him."

249. Despite Mr. Mack's attempts to have prison offcials rein in G-Block Officers' campaign of terror and psychological torment waged against him, Offcicers Sheesley, Finck, Chappell, Sullivan, Beaver, Moyer and others, continued to harass and threaten him on a daily basis the entire time which he was housed on G-Block.

250. On May 25, 2017, Mr. Mack was finally reassigned and moved back to X-Block housing unit, in accordance with his Protective Custody status.

251. When Mr. Mack was moved off of G-Block, on May 25, 2017, he was immediatelytaken off of the Lt. Hold, Two Man Escort. and Double Cuff status, of which he was placed on following G-Block Officer's assault on him.

252. During the remainder of Mr. Mack's stay in the SMU Officers Moyer and Chappell were both reassigned to his range on X-Block for two days a week, as their work post, where they both continued to subject Mr. Mack to further on-going harassment and threats of violence.

253. C.O. Chappell told Mr. Mack that no matter where he moved that they could get to him anywhere in the prison at anytime.

254. C.O. Moyer threatened to call Sheesley over to X-Block to "pay [Mr. Mack] a visit."

255. Mr. Mack was never able to eat his lunch tray the entire time that he was

housed on G-Block, and on the days that Officers Chappell and Moyer worked his range on X-Block, because G-Block Officers threatened to kill him and would serve him his lunch trays accompanied with taunts that they had contaminated his food. And on many occasions Officers Sheesley, Sullivan, and Beaver had served him lunch trays which they had defiled with spit splattered on his food and, at times, a liquid substance poured over his food which reeked, strongly, of cleaning chemicals and urine.

256. Mr. Mack knows of other inmates on G-Block who complained about G-Block Officers tampering with their food, as harassment, as well.

257. G-Block Officers' harassment and threats of voilence prevented Mr. Mack from ever going to the shower, recreation, or the law library the entire time that he was housed in G-Block.

258. And while Mr. Mack was housed on G-Block there were many other inmates on G-Block who did not ever leave their cells to go to the shower or recreation because of their fear of being assaulted by G-Block Officers in one of their "blind-spots" or that the officers would "accidently" place/force them into a recreation cage with hostile inmates who would likely violently attack them.

259. G-Block Officer's psychological torment and terror of Mr. Mack caused him to suffer a great deal of emotional distress and psychological harm.

260. Mr. Mack pleaded with and complained, both verbally and in writing, to SMU Officials, including Defendants Kane, Norwood, Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Beachel, and Kemmerer that G-Block Officers had physically assaulted him, and was subjecting him to ongoing daily harassment and threats of violence.

261. Defendants Norwood, Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Beachel, and Kemmerer had the authority to have Mr. Mack reassigned to another housing unit, away from the G-Block Officers who assaulted him and continued to harass and threaten him with violence, or to take other reasonable actions to abate G-Block Officer's continued harassment and threats of violence towards Mr. Mack.

262. Despite this knowledge, Defendants Norwood, Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Beachel, and Kemmerer refused to have Mr. Mack reassigned to another housing unit, and failed to act reasonably in response.

263. Defendants Norwood, Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Beachel, and Kemmerer kept Mr. Mack in G-Block housing unit for over 3 months after being physically assaulted by G-Block Officers in the cruel and inhumane conditions of confinement described above, knowing that it was sure or very

likely to cause substantial risk of serious harm, unreasonable threat of injury, and needless suffering to Mr. Mack.

264. Defendants Carvajal and Norwood knew of Mr. Mack's conditions of confinement at USP Lewisburg, as described above, and approved of USP Lewisburg Officials' refusal to reassign Mr. Mack to another housing unit,and failure to take other reasonable measures.

265. Defendants Sheesley, Finck, Chappell, Sullivan, Beaver, Savage, and Moyer lacked penological and/or security justification to treat Plaintiff in the manner as described above during his entire confinement in G-Block housing unit.

267. Defendants Sheesley, Finck, Chappell, Sullivan, Beaver, Savage, and Moyer acted wantonly, miliciously, and willfully.

268. As a direct and proximate result of said acts of Defendants, Plaintiff Mack suffered, and continues to suffer, the following injuries and damages:

    a. Violation of his rights under the First, Fifth, and Eighth Amendment to the United states Constitution;

    b. Violation of his rights under the Federal Tort Claims Act;

    c. physical injuries;

    d. mental injuries;

    e. emotional distress;

    f. pain and suffering

## CAUSES OF ACTION

### Count I

Plaintiff Jeremy Mack vs. Defendants The BOP, Kane, Norwood, Ebbert, Butler, Kazuba and Jusino

Tort of Negligent Failure to Protect, Under the Federal Tort Claims Act

269. Plaintiff incorporates by reference the allegations in the preceding par paragraphs of this complaint.

270. Defendants BOP, Kane, Norwood, Ebbert, Butler, Kazuba, and Jusino are responsible for the training, supervision, and control of thr prison guards at

USP Lewisburg.

271. Defendants BOP, Kane, Norwood, Ebbert, Butler, Kazuba and Jusino owed
Plaintiff a duty of reasonable care to protect from assaults by staff, under
the law of Pennsylvania and 18 U.S.C. Section 4042.

272. Defendants BOP, Kane, Norwood, Ebbert, Butler, Kazuba, and Jusino breached
that duty by failing to provide protection when Plaintiff was viciously assaulted
without need or provocation by Defendants Sheesley, Chappell, Finck, and Savidge
on February 16, 2017.

273. The breach of duty resulted in serious physical and emotional injury and
pain.

274. The breach of duty proximately caused those damages.

275. Plaintiff's right to be free from assault and battery under the law of
Pennsylvania and 18 U.S.C. Section 4042 was clearly established as of February 16,
2017.

276. Defendants, acting under the color of Federal Law, deprived Plaintiff of
his right to be free from assault and battery under the law of Pennsylvania and 18
U.S.C. Section 4042.

277. Defendants BOP, Kane, Norwood, Ebbert, Butler, Kazuba and Jusino as alleged
committed the Tort of Negligence against Plaintiff by their acts or omissions, as
described above.

278. Due to the Defendants' acts and omissions, Plaintiff suffered serious
physical and emotional injury and pain, and is therefore entitled to relief.

Count II

Plaintiff Jeremy Mack vs. Defendants Sheesley,

Chappell, Finck and Savidge

Eighth Amendment Violation, pursuant to BIVENS v.
SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS,
403 U.S. 388 (1971), for the Defendant's attack on Plaintiff on February 16, 2017

279. Plaintiff incorporates by reference the allegations in the preceding
paragraphs of this Complaint.

280. Plaintiff's right to be free from cruel and unusaul punishment under
the Eighth Amendment to the United States Constitution was clearly established
as of February 16, 2017.

281. While acting under color of Federal Law, the actions of Defendants Sheesley, Chappell, Finck, and Savidge in using physical force against the Plaintiff without need or provocation, were done maliciously and sadistically and Constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

282. Due to the Defendant' acts and omissions, Plaintiff suffered serious physical and emotional injury and pain, and is therefore entitled to relief.

Count III

Plaintiff Jeremy Mack vs. Defendants Sheesley, Chappell, Finck, Sullivan, Beaver and Moyer

Eighth Amendment Violation, pursuant to BIVENS. v. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1971), for terrorizing Plaintiff from February 16, 2017 to May 25, 2017

283. Plaintiff incorporates by reference the allegations in the proceding paragraphs of this Complaint.

284. Plaintiff's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution was clearly established as of February 16, 2017.

285. Defendants' actions directed towards Plaintiff were unnecessary , wanton, dehumanizing and cruel, and were maliciously and sadistically motivated to cause harm.

286. Defendants, acting under color of Federal Law, deprived Plaintiff of his Constitutional right to be free from cruel and unusual punishmnet.

287. Defendants Sheesley, Chappell, Fick, Sullivan, Beaver, and Moyer violated Plaintiff's Eighth Amendment rights by their conduct, as described above.

288. Due to the Defendants' acts and omissions, Plaintiff suffered serious emotional and psychological pain and injury, and is therefore entitled to relief.

Count IV

Plaintiff Jeremy Mack vs. Defendants Sheesley, Sullivan and Hackenburg

First Amendment Violation, pursuant to <u>BIVENS v.</u>
<u>SIX</u> <u>UNKNOWN</u> <u>NAMED</u> <u>AGENTS</u> <u>OF</u> <u>THE</u> <u>FEDERAL</u> <u>BUREAU</u> <u>OF</u> <u>NARCOTICS</u>,
403 U.S. 388 (1971),
for retaliating against Plaintiff for redress of Grievances

289. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

290. Plaintiff's right under the First Amendment to the United States Constitution to be free from retaliation for redress of grievances was clearly established as of February 16, 2017.

291. Defendants, acting under color of Federal Law, deprived Plaintiff of his right to be free from retaliation for seeking redress of grievances.

292. Defendants Sheesley, Sullivan, and Hackenburg violated Plaintiff's First Amendment right by their conduct, as described above.

293. Due to the Defendants' acts, Plaintiff suffered serious emotional and psychological pain and injury, and is therefore entitled to relief.

Count V

Plaintiff Jeremy Mack vs. Defendants BOP, Kane, Norwood,
Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes,
Taggart, Konkle, Doe, Beachel and Kemmerer

Eighth Amendment Violation

294. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in this Complaint.

295. Plaintiff ^HAS a right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. This means that prison officials must protect prisoners from excessive risks of substantial harm.

296. USP Lewisburg Officials and Officers engage in a pattern of abusing and assaulting inmates in "blind-spots" of the prison while they are in restraints, subjecting inmates to an environment of fear, systemic harassment, intimidation, retaliation for seeking redress to grievances, retaliatory cell searches, and the unjustified confiscation and/or damaging of inmates legal materials and personal property. Such threat creates a substantial

risk to inmates' health and safety, and Constitutional protections. The Plaintiff has been subjected to these Constitutional Violations.

297. Because USP Lewisburg Officials and Officers maintains a systemic corrupt culture of staff cover-ups of inmate abuse, disregard excessive risk to inmates' health and safety, and fail to respond appropriately in the face of awareness of the above described unconstitutional patterns, practices, or policies, Defendants have failed to protect Plaintiff from the pervasive abuse, brutalization, and Constitutional misconduct of their colleagues.

298. Defendant the BOP is responsible for inmate safety at all USP institutions, including USP Lewisburg. As such, the BOP is responsible for ensuring that the conditions of confinement in its facilities do not violate the Constitution.

299. Defendants Kane, Norwood, Carvajal, Ebbert, Jusino, Butler, and Kazuba are responsible for creating and implementing policy at the BOP is institutions under their control, including USP Lewisburg. As such, each Defendant has a responsibility to ensure that the conditions of confinement at USP Lewisburg do not violate the Constitution.

300. Defendants Kane, Norwood, Carvajal, Ebbert, Jusino, Butler, and Kazuba were, at all times relevant to this complaint, aware of the conditions of confinement at USP Lewisburg by virtue of both the requirements of their positions and the inmate grievance process.

301. The inmate grievance policy requires that grievances be reviewed first by Ebbert, and if the grievance is denied, the inmate must then grieve to Norwood and Carvajal, and finally to Kane.

302. Upon information and belief, hundreds of grievances have been filed since the inception of the SMU program complaining of these conditions of confinement at USP Lewisburg, including Plaintiff's own grievances.

303. Defendant Ebbert, as Warden of USP Lewisburg, is informed as a matter of course of any alleged staff misconduct and staff abuse of inmates.

304. Defendants Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Doe, Beachel, and Kemmerer are also aware of the day to day problems and incidents related to inmates' placement and conditions of confinement at USP Lewisburg by virtue of their responsibility for inmate safety and institutional security.

305. In overseeing conditions of confinement and participating in inmate placement decisions, Defendants Ebbert, Jusino, Butler, Kazuba, Rhodes, Taggart, Konkle, Doe, Beachel, and Kemmerer are required to consider inmates' special needs, and their safety and health risk of Constitutional injury.

306. Defendants BOP, Kane, Norwood, Carvajal, Ebbert, Jusino, Butler, and Kazuba are responsible for creating and implementing policies and customary course of action at USP Lewisburg, under which the above described unconstitutional practices occurred.

307. Defendants, acting under color of Federal Law, engaged in the unconstitutional patters, practices, or policies of (1) maintaining a pervasive culture of inmate abuse an staff-on-inmate assaults, (2) assaulting inmates in "blind-spot" areas of the prison while they are in restraints, (3) systemic harassment and intimidation of inmates, (4) creating an atmosphere of fear foe inmates, (5) retaliating against inmates for seeking redress of their grievances, orally and in writing, (6) conducting retaliatory cell searches – "shake-downs" – of inmate's cells, (7) unjustified confiscation and/or damaging of inmate's legal materials and personal property, and (8) maintaining a corrupt culture of staff cover-ups and abuse. Furthermore, Defendants, again acting under color of Federal Law, engaged in the unconstitutional patterns, practices, or policies of disregarding excessive risk to inmates' health and safety, and failing to respond appropriately in the face of awareness of the above described unconstitutional patterns, practices, or policies. Thus, Defendants have deprived Plaintiff of his right to be free from cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

308. Defendants' acts and omissions have caused serious injury to Plaintiff, and therefore the Plaintiff is entitled to relief.

Count VI

Plaintiff Jeremy Mack vs. Defendants BOP, Kane, Norwood,
Carvajal, Ebbert, Jusino, Butler, Kazuba, Rhodes,
Taggart, Konkle, Doe, Beachel and Kemmerer

Eighth Amendment Viloation

309. Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in this Complaint.

310. Plaintiff has a right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. This means

that prison Officials must provide prisoners with humane conditions of confinement.

311. Defendants, acting under color of Federal Law, engaged in the unconstitutional patters, practices, or policies of (1) maintaining a pervasive culture of inmate abuse and staff-on-inmate assaults, (2) assaulting inmates in "blind-spot" areas of the prison while they are in restraints, (3) systemic harassment and intimidation of inmates, (4) creating an atmosphere of fear for inmates, (5) retaliating against inmates for seeking redress of their grievances, orally and in writing, (6) conducting retaliatory cell searches – "shake-downs" - of inmate's cells, (7) unjustified confiscation and/or damage of inmate's legal materials and personal property, and (8) maintaining a corrupt culture of staff cover-ups and abuse. Furthermore, Defendants, again acting under color of Federal Law, engaged in the unconstitutional patterns, practices, or policies of disregarding excessive risks to inmates' health and safety, and failing to respond appropriately in the face of awareness of the above described unconstitutional patterns, practices, or policies. Thus, Defendants have deprived Plaintiff his Constitutional right to be provided with humane Conditions of Confinement, pursuant to the "Totality of Conditions" theory, in violation of the Eighth Amendment to the United States Constitution.

312. Defendants' acts and omissions have caused serious injury to Plaintiff, and therefore the Plaintiff is entitled to relief.

### G-Block Officers Interfered With
### Plaintiff's Access To The Courts

313. Plaintiff incorporates paragraphs 1 through 312 in the preceding paragraphs of this Complaint as though they were stated fully herein.

314. When the United States Supreme Court denied Plaintiff's request to review his case his Appellate Attorney, Donald J. Malarcik, informed him that his deadline for filing his Habeas Petition, pursuant to 28 U.S.C. Section 2255 was "no later than March 4, 2017.

315. Acting Pro Se, Plaintiff prepared a meritorious Habeas Petition pursuant to 28 U.S.C. Section 2255, challenging his criminal conviction on the grounds of Prosecutorial Misconduct and Ineffective Assistance of Counsel, in attempt to have his conviction set aside.

316. By the end of January, 2017, Plaintiff had his 2255 Petition prepared to be filed to meet his March 4, 2017 court deadline.

317. On or about February 14, 2017, Plaintiff received his $19.60 order of postage stamps from the prison commissary that he needed to be able to mail his 2255

Petition to the courts ahead of his court deadline.

318. When Plaintiff received his order of postage stamps from commissary he placed his prepared 2255 Petition and Exhibits within an extra-large manila envelope addressed to : Office of the Clerk, U.S. District Court, Northern District of Ohio, 2 South Main Street, Akron, Ohio 44308, with the proper amount of postage, and properly marked "LEGAL MAIL" on the front of the envelope, so that it was prepared to be submitted to a Unit Team staff member to be mailed.

319. However, as described above, on February 16, 2017, G-Block Officers Sheesley, Finck, Chappell, and Savidge unjustifiably confiscated Plaintiff's prepared 2255 Petition, as well as other non-contraband legal materials and personal property during a maliciously motivated "cell search."

320. Plaintiff placed many months of research and hard work into preparing his 2255 Petition and Exhibits. Many of those Exhibits consisted of irreplaceable documents. Without these legal materials Plaintiff was unable to meet his filing deadline to the courts. Thus, Defendants Sheesley, Finck, Chappell, and Savidge have prevented Plaintiff from challenging his criminal conviction on collateral review by confiscating his prepared 2255 Petition and Exhibits and thereby causing him to miss his filing deadline.

In Accordance With <u>MONROE v. BEARD</u>
Plaintiff Presents Facts To Demonstrate
Arguable Claims To Be Nonfrivolous

321. On or about 05/13/2013 Attorney Edward G. Bryan, Assistant Federal Public Defender, was appointed to represent Plaintiff in his criminal case, Case Number: 1:13-cr-00278-SL-1.

322. On or about 07/25/2013 Attorney Carolyn M. Kucharski, Assistant Federal Public Defender, was appointed as Co-Counsel to represent Plaintiff in his criminal case, Case Number: 1:13-cr-00278-SL-1.

323. Plaintiff informs his Attorneys, Mr. Bryan and Ms. Kucharski, that he is innocent of his criminal charges and his intentions to exercise his right to have a jury trial.

324. In preparing to defend Plaintiff at trial, his Attorneys conducted an investigation into his case and discovered evidence that the FBI Agent who brought the case against Plaintiff, Special Agent Kelly Liberti, may have tampered with several witnesses in the case and may have coerced and/or coached the alleged

"Victims" in an attempt to build a case against Plaintiff.

       325. Among other things, this evidence includes:

1. Monica Freedman, a witness in the case, informed Plaintiff's Attorneys that Agent Liberti visited with Freedman while she was in Jail and told her that she, Agent Liberti, could make her charges go away, while seeking incriminatory statements against Plaintiff in her case.

2. Based on the fact that Agent Liberti was able to coerce two of the Plaintiff's unindicted co-conspirators to not only make false accusations against the Plaintiff in his indictment, but was also able to coerce them to make their false accusations to align in corroboration, Plaintiff feared for how Agent Liberti may be able to potentially influence the statements of the other, many, unindicted co-conspirators and witnesses in the case.

While Plaintiff was a pre-trial detainee at Corrections Corporation of America (CCA) called witnesses Kathrine Frioud and Sara Crabtree seeking their assistance in obtaining sworn affidavits from all witnesses and unindicted co-conspirators related to the case before Agent Liberti would be able to intimidate, manipulate, and coerce them to make false statements which incriminate the Plaintiff.

Frioud and Crabtree informed Plaintiff that they would print out affidavits and take them to all of the witnesses and unindicted co-conspirators in the case to get their notarized statements.

At that time CCA Officials were forwarding the recordings of all of Plaintiff's jail telephone calls to Agent Liberti.

A few days later Agent Liberti was involved in the execution of a search warrant, raid, of the residence Frioud and Crabtree was known to be residing. At which time, Officers escorted Agent Liberti into the residence to where Frioud and Crabtree were sitting, among other occupants of the residence, and an Officer pointed at Frioud and Crabtree and told Agent Liberti, "there's your girls."

During the search of the residence Officers discovered about an ounce of crack cocaine and about a half ounce of heroin in a safe located in the closet of the master-bedroom.

Despite the fact that Frioud and Crabtree did not share the master-bedroom, where the drugs were discovered, with the main occupant of the residence, who was known to law enforcement as a drug dealer, Frioud and Crabtree were the ones who was arrested and charged for those drugs.

Although Agent Liberti had previously interviewed Frioud and Crabtree about the case, Plaintiff's Attorneys learned that Agent Liberti visited Frioud and Crabtree in jail after their arrest and pressured them to make incriminating statements against Plaintiff in his case.

3. Plaintiff's Attorneys learned that while Frioud and Crabtree were arrested and jailed out-of-town, on other drug charges unrelated to Plaintiff's criminal case, agent Liberti traveled to where they were jailed the day after their arrest and, again, pressured them to make incriminating statements against Plaintiff in his case.

4. Plaintiff's Attorneys learned that Plaintiff's co-defendant, Ashley M. Onysko, called Frioud and Crabtree from jail on the date of her arrest and told Frioud and Crabtree that the allegations in the indictment against Onysko and Plaintiff were false and "a bunch of lies" (This recorded jail call was later obtained by Plaintiff's Attorneys).

And that after being Interrogated by Agent Liberti, while facing a mandatory minimum of 15 years to life prison sentence, Onysko ended up providing Agent Liberti a statement in which she changed her story to corroborate the allegations in the indictment.

It was later discovered that Onysko was offered a deal for her "cooperation" with Agent Liberti in the case. Which resulted in Onysko only having to serve less than three years in federal prison for the same conduct as Plaintiff, while Plaintiff received a life

sentence in prison without the possibility of parole.

5. Plaintiff's Attorneys learned that during a recorded jail call made by Plaintiff to Charlie Blevins, one of the key witnesses in the case, Blevins told Plaintiff that Agent Liberti kept texting her and would not leave her alone, and informed Plaintiff that Agent Liberti was telling her that she was a "victim," and that she needed to talk to Blevins. Blevins said that she responded to Agent Liberti's text messeges by telling her that she did not know what Agent Liberti was talking about and that she did not want to talk to her. Plaintiff instructed Blevins to contact his Attorneys to figure out what to do. (These recorded jail calls were forwarded to Agent Liberti, and have been preserved as evidence in the case).

Plaintiff's Attorneys learned that before Blevins and his Attorneys were able to get into contact with eachother to discuss the case, that Agent Liberti had threatened to subpoena Blevins and pressured her to end up meeting with Agent Liberti. And that Agent Liberti had brought along a Victims Advocate to meet with Blevins to persuade Blevins to sign up as a "victim" to receive "victims benefits."

6. Plaintiff's Attorneys learned that, while in CCA, Plaintiff had received a letter from Sharon Lawson, a witness in the case, informing Plaintiff that she was in drug rehab with Sara Williams, an alleged "victim" in the case, and that Williams had a Victims Advocate who would come to see her. Lawson also said in her letter that when she asked Williams why a Victim's Advocate was coming to see her that Williams told her that the Victim's Advocate was telling her that she was a "victim." Plaintiff's Attorneys obtained Lawson's letter to Plaintiff as evidence in the case.

7. Plaintiff's Attorneys contacted Blevins after she and Williams were added as "victims" in Plaintiff's case and learned that Blevins was unaware that Agent Liberti had charged Plaintiff with her as a victim in his case.

Blevins informed Plaintiff's Attorneys that she told Agent Liberti that neither she nor any of the other alleged "victims" in the case was not forced by Plaintiff to prostitute themselves and that the other alleged "victims" lied about what they had alleged about the Plaintiff.

Blevins also informed Plaintiff's Attorneys that while Agent Liberti took notes during her interview with Blevins, Agent Liberti did not take notes of her statements about anything she stated about how she and none of the other alleged "victims" were never forced to prostitute for Plaintiff.

After getting in contact with Blevins, Plaintiff's Attorneys and Blevins began communicating back and forth regularly, discussing matters in the case. Agent Liberti knew that Blevins, the most important witness in the case whom she had charged Plaintiff with as a victim in his case, was defending the Plaintiff's innocence in discussions with his Attorneys, thereby jeopardizing Agent Liberti's case. Agent Liberti knew about these things because Plaintiff kept his family informed of these things through their telephone conversations which Agent Liberti was receiving the recordings of.

8. Plaintiff's Attorneys discovered that the Hotel room which Mary Bisco, an alleged "victim" in Plaintiff's case, had been renting was raided by local law enforcement officials who found drugs and drug paraphernalia in the Hotel room. And that while one person who was in the Hotel room with Bisko was arrested and charged with what was found in Bisko's Hotel room, Agent Liberti may have been contacted and stepped in to prevent Bisko from also being arrested and charged to influence the outcome of Plaintiff's case.

9. Blevins was later caught up in a prostitution sting and arrested in the Cincinnati, Ohio, area. Agent Liberti was notified of Blevins' arrest and had Blevin's cell phone seized. Agent Liberti was aware that Blevin's cell phone contained text message communications between Blevins and Plaintiff's Attorneys related to the case.

326. Aware that Plaintiff's Attorneys were preparing to present evidence at Plaintiff's Jury Trial that would test their Chief Investigator's, Agent Liberti's, credibility by presenting evidence of Agent Liberti's witness tampering to Plaintiff's jury, as a tactical advantage the Government sought to have Plaintiff's Attorneys removed from his case.

327. On or about 10/28/2013, with only a few days to go before Plaintiff's Jury Trial was set to commence, the Assistant United States Attorneys on Plaintiff's case, Bridget M. Brennan and Carol M. Skutnik, advised the Court that the Government was moving to disqualify Plaintiff's Attorneys from representing Plaintiff in his case.

328. On 11/02/2013 the Government filed a motion to Disqualify Plaintiff's Attorneys for "Conflict of Interest," claiming that Plaintiff's Attorneys may be charged for Obstruction of Justice in Plaintiff's case. In their motion, the Government presented excerpts of text messages and e-mails extracted from Blevins cell phone which Agent Liberti seized from Blevins when she was arrested, and claimed that Plaintiff's Attorneys violated the Court's no-contact order, of which the Courts ordered Plaintiff to not have contact with the witnesses in his case.

329. The Government argued that Plaintiff's Attorneys violated the no-contact order by e-mailing Blevins a letter from Plaintiff and a photo of him that Blevins requested Plaintiff's Attorneys send her.

330. On 11/04/2013 Plaintiff's Attorneys filed to the Courts a Response in Opposition to the Government's motion to Disqualify Plaintiff's Attorneys. In their motion, the Plaintiff's Attorneys pointed out the facts that the Plaintiff's letter, which the Plaintiff's Attorneys e-mailed to Blevins, was a copy of a letter that Plaintiff wrote to Blevins and mailed to her prior to Blevins being made a "victim" in Plaintiff's case, which was intercepted by mail room staff at CCA, forwarded to the Government, and disclosed of to Plaintiff's Attorneys within the Government's Discovery, and that it was not a letter Plaintiff had given to his Attorneys to circumvent the Court's no-contact order, as the Government had claimed.

331. Plaintiff's Attorneys argued that the letter and photo of Plaintiff was provided to them by the Government as evidence in the case and that they owed the Plaintiff their duty of due diligence in the case, which includes their responsibility to interview all witnesses and alleged victims in their case and to review all evidence in the case with the witnesses and alleged victims.

332. On 11/04/2013 through 11/05/2013 the Court held a two-day hearing inquiry into the Government's motion to Disqualify Plaintiff's Attorneys to determine whether or not an actual Conflict of Interest exist in the case. During the two-day hearing

Plaintiff's Attorneys accused the Government of attempting to Manufacture a Conflict of Interest in order to have them removed from Plaintiff's case, and the Government of repeatedly threatening Plaintiff's Attorneys with charges of Obstruction of Justice in open court and in the Judge's chambers. When the two-day hearing concluded the Court took the matter under advisement and decided to issue a ruling at a later date.

333. On 11/06/2013 Plaintiff's Attorney's Boss, Dennis G. Terez, the head of the Federal Public Defenders Office, filed a motion for Office of the Federal Public Defenders to Withdraw as Attorneys for Plaintiff.

334. On 11/07/2013 the Court held a hearing on the Motion to Withdraw, and granted the Federal Public Defenders Office's Motion to Withdraw from the case.

335. Attorney Bryan informed Plaintiff that his Boss, Terez, decided to have him and Kucharski removed from the case because the Government kept calling Plaintiff's Attorneys threatening them with Obstruction of Justice charges and that they told his Boss that their office would not pursue Obstruction charges if he removed them from Plaintiff's case. Attorney Bryan further offered to provide Plaintiff an affidavit stating these facts for Plaintiff's appeal of his case.

336. When Attorneys Bryan and Kucharski were removed from Plaintiff's case, the Courts appointed Attorneys Lawrence J. Whitney as Lead Counsel and Nathan A. Ray as co-counsel to represent Plaintiff in his case.

337. Plaintiff informed Attorney Whitney as to how the Government repeatedly threatened his former Attorneys with Obstruction charges to intentionally have them removed from his case, and requested that Whitney file a Motion of his behalf to have the Government's Attorneys removed from his case for Prosecutorial Misconduct.

338. Whitney refused to file the motion and told Plaintiff that he would have to raise grounds of Prosecutorial Misconduct on appeal if he were to get convicted.

Prosecutorial Misconduct

339. The Government's Attorneys in the case were aware that Plaintiff's Attorneys were gearing up to present a defense at Plaintiff's trial that would present evidence of Agent Liberti's witness tampering and Official Misconduct to the Jury to contest the credibility of Agent Liberti's case.

340. As a tactical move to prevent Plaintiff's Attorneys from presenting a defense at trial which had the potential to expose their case being built upon Agent Liberti's witness tampering and misconduct, the Government's Attorneys Manufactured a "Conflict of Interest" to attempt to have Plaintiff's Attorneys removed from the case.

341. The Government's Attorneys knew that their claims that a Conflict of Interest existed with Plaintiff's Attorneys was Frivolous, based on the facts that they knew that the letter and photo Plaintiff's Attorneys had shared with Blevins was evidence in the case, and that they knew that the Plaintiff had not, in fact, directed his Attorneys to provide a letter to Blevins in order to circumvent the Courts no-contact order.

342. And when Plaintiff's Attorneys stood firmly opposed to, challenging, the Government Attorney's allegations that an actual "Conflict of Interest" existed between them and the case, the Government's Attorneys repeatedly threatened Plaintiff's Attorneys with Obstruction of Justice charges.

343. While the Government's Attorneys may of had a right to place Plaintiff's Attorneys on notice that they may pursue Obstruction charges, the Government's Attorneys in the case misconducted themselves in intimidating Plaintiff's Attorneys and abusing their authority by repeatedly threatening Plaintiff's Attorneys with Obstruction of Justice charges. The Government's Attorneys crossed the line between placing Plaintiff's Attorneys on notice that they may be charged by repeatedly threatening them with Obstruction charges.

344. Plaintiff's Trial Attorneys, Whitney and Ray, did not pursue the same trial strategy, as his former Attorneys, of vigorously exposing Agent Liberti's unlawful misconduct and attacking her credibility in the case that she brought against Plaintiff, as Plaintiff's former Attorneys were mounting Plaintiff's defense, preparing to do.

345. Accompanying Plaintiff's Section 2255 Petition was a request for an Evidentiary Hearing, for the Courts to develop facts outside the record, relating to Plaintiff's claims of Prosecutorial Misconduct, which, if true, would of entitled Plaintiff to Habeas relief.

CAUSE OF ACTION

Count VII

Plaintiff Jeremy Mack vs. Defendants Sheesley,
Finck, Chappell and Savidge

Fifth Amendment Violation

346. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

347. Plaintiff's right under the Fifth Amendment of the United States Constitution to Due Process in connection with a deprivation of Access to the Courts was clearly established as of February 16, 2017.

348. Defendants Sheesley, Finck, Chappell, and Savidge violated plaintiff's Fifth Amendment rights by depriving him of his Due Process right to file a meritorious Habeas Petition and request to the Courts for an Evidentiary Hearing by confiscating his legal materials on February 16, 2017 without any penological purpose.

349. Defendants Sheesley, Finck, Chappell, and Savidge caused Plaintiff to lose the oppertunity to file "nonfrivolous" claims and to request an Evidentiary Hearing from the Courts and to be forever barred from pursuing his Federal Post Conviction remedy.

350. Defendants Sheesley, Finck, Chappell, and Savidge deprived Plaintiff of his right to file a meritorious Habeas Petition and Request for an Evidentiary Hearing to the Courts. This deprivation of attempting to have his conviction set aside caused Plaintiff severe emotional distress.

351. There is no other relief which Plaintiff can be compensated by Defendants for his lost Claims and Post conviction remedy, other than damages.

352. As a direct and proximate result of the said acts of Defendants, Plaintiff suffered, and continues to suffer the injuries and damages described above, and is therefore entitled to relief.

## Unlawful Censorship of Mail

353. In order to foster and maintain the corrupt culture of inmate abuse ans staff cover-ups at USP Lewisburg, Defendants engage in a pattern, practice or policy of censoring inmate's non-legal mail, if the inmate complains about inmate abuse, staff misconduct, or their conditions of confinement, and interfering with those intended communications.

354. Pursuant to policy and practice all SMU inmate's outgoing mail is read by staff before being processed out of the prison.

355. Usually all mail is read by the Housing Unit's evening shift Officers before being processed out of the Housing Unit.

366. Because of this, USP Lewisburg inmates are not permitted to seal-up their outgoing non-legal mail.

367. SIS staff engage in a pattern, practice or policy of maintaining a "mail monitoring" list of inmates whose incoming and outgoing non-legal mail is suppose to be forwarded to SIS by Unit staff and mailroom staff before being processed out of the prison or to the inmate recipient. SIS staff ensures that their "mail monitoring"

list is accessible to all Housing Unit and mailroom staff who handle inmate mail.

368. It is the duty of all staff who handle inmate mail to forward all incoming and outgoing non-legal mail of the inmates who are listed on SIS's "mail monitoring" list to SIS.

369. Under BOP policy, only the Warden is permitted to authorize the targeted censorship of an inmate's mail. And even then, according to policy, the Warden must conduct periodic reviews of the inmates' mail monitoring status and find just cause in order to authorize the inmate's continued placement on mail monitoring status.

370. SIS conducts and oversees the "mail monitoring" of SMU inmates.

371. At USP Lewisburg, however, SIS staff circumvent BOP's policy by placing inmates on "mail monitoring" status without the Wardens' authorization or oversight. In doing so, SIS is effectively able to side-step their required duty to maintain records of all inmates whose mail that they have been responsible for. Allowing SIS staff to target inmate's mail, whom are known to complain and seek redress of grievances for inmate abuse, staff misconduct, and conditions of confinement, under the radar without any repercussion.

372. Furthermore, SIS fails to maintain records of all revised "mail monitoring" lists which are accessible to Housing Unit and mailroom staff who handle inmate mail.

373. In addition, no record-logs were being kept by Housing Unit and mailroom staff to record what mail was being forwarded to SIS staff.

374. It is the practice and custom for the Housing Unit Officers, who reads inmate outgoing mail, to forward all mail with any "questionable" content to SIS for their review. This includes, but is not limited to, allegations of staff misconduct, inmate abuse, and complaints about unconstitutional conditions of confinement at USP Lewisburg

375. Under these circumstances, SMU inmate's intended communications are frequently interfered with for no legitimate reason, but for the purpose to suppress inmates' expressed complaints or grievances.

376. Defendants are aware of the unlawful censorship of inmates mail, as described above.

377. Inmates at USP Lewisburg were without any meaningful oversight and have no process by which to challenge the unlawful censorship of inmate's mail. This constitutional misconduct exist wholly outside of BOP Policy and Federal Regulations.

378. Upon information and belief, Defendants are involved and/or are aware of the unlawful censorship of inmate's mail patterns, practices, policies, know the risks of harm posed by these practices,, and fail to make any changes to these policies and practices at USP Lewisburg to abate the risks of harm.

USP Lewisburg Staff's Unlawful Censorship
of Mr. Mack's Mail While Housed at the SMU

379. Within the first couple of months after Plaintiffs' arrival to the SMU it had become clear to him that staff were routinely throwing away his outgoing and incoming mail.

380. It all began when Plaintiff started filing Freedom of Information Act and Privacy Act (FOIA/PA) requests to the BOP's Central Office, which were forwarded to USP Lewisburg Officials to respond to, seeking records related to USP Lewisburg Officials unlawful use of restraints on inmates, as well as the Government e-mail addresses of the Warden, Unit Manager, and other USP Lewisburg staff. And after he mailed out an "EMERGENCY GRIEVANCE," as "LEGAL MAIL," to the BOP's Northeastern Regional Director complaining about USP Lewisburg staff forcing him to cell-up with hostile cellmates, which was causing him to suffer homicidal thoughts due to his fear of being attacked and killed by a cellmate, within his first month in the SMU.

381. Upon receiving Plaintiff's "EMERGENCY GRIEVANCE," the Regional Director's Office contacted USP Lewisburg Officials and informed them about Plaintiff's complaints to the Regional Director, which prompted Dr. Eigenbrode of psychology services to conduct a follow-up with Plaintiff.

382. About two weeks later Plaintiff mailed out a letter to his sister and a letter to one of his churches Prison Ministry's pen-pal friends, whom he had been corresponding with regularly, and asked them both to scan and e-mail, to the Warden at USP Lewisburg, the letter which he had enclosed in with their letters.

383. Within those letters that Plaintiff had asked his sister and Prison Ministry pen-pal friend to e-mail to the Warden, he complained about being forced to cell with hostile cellmates, and staff's refusal to move him although he had informed Unit Staff on multiple occasions that he and his cellmate was not getting along and that someone was going to get seriously hurt if staff do not separate them.

384. About a month, or so, later Plaintiff discovered that neither his sister nor his Prison Ministry pen-pal friend never received his letters to them and the enclosed letters to the Warden, complaining.

385. Sometime around his second month in the SMU Plaintiff had submitted to staff, over the span of a few days, about a total of ten letters, to be mailed out to family members, friends, and Prisoners' Advocacy Organizations complaining about his abuse and unconstitutional conditions of confinement at USP Lewisburg.

386. Plaintiff did not receive any response back from any of those ten, or so, leters. And as time went on he discovered that his family and friends never did receive those letters from him.

387. Plaintiff would usually discover that his family members and friends were not receiving his letters when he would receive their letters of concern, wanting to know if was OK and why they have not heard from him.

388. Over the course of the next year, or so, Plaintiff's family members and friends had only received a few of the letters, out of the several dozen, or so, he had written to them and submitted to staff.

389. In nearly all of Plaintiff's letters, which he had submitted to staff to be mailed out to family members, friends, and elsewhere, he raised the issues of his abuse, his unconstitutional conditions of confinement, and had sought their help and support to deal with it.

390. Of all the letters which Plaintiff submitted to staff to be mailed out to his family members and friends, the only few letters which were actually processed out of the prison and received were the letters which Plaintiff had refrained from discussing anything about his abuse or his conditions of confinement.

391. Also, on several occasions Plaintiff received letters from family members and friends referencing letters that they had written and sent to him , which he never received.

392. Staff's unlawful censorship of Plaintiff's outgoing and incoming mail had significantly impacted his relationship and bond with his children, family members, and friends.

393. Plaintiff had come to understand that the only way that he might get a letter processed out of the prison to be able to let his love ones know that he was thinking about them, and that he loves and misses them, was to not mention anything about his conditions of confinement at USP Lewisburg.

394. Plaintiff was informed by multiple staff that he was, in fact, on SIS's "mail monitoring" list and that all his mail was going through SIS.

395. In attempt to figure out if the prison's Administration was, in fact, aware that SIS had targeted his mail for censorship, on or about July 21, 2016, Plaintiff sent a FOIA/PA request to the BOP's FOIA/PA Section seeking a copy of all records related to the targeted censorship of his outgoing and incoming non-privileged/legal mail by staff at USP Lewisburg.

396. In response to Plaintiff's July 21, 2016, FOIA/PA request, the BOP said that no records responsive to his request were located.

397. To be sure that there was not any records responsive to Plaintiff's July 21, 2016, FOIA/PA request he appealed the BOP's response to the Director of the Office of Information Policy (OIP) to have the BOP conduct a thorough search for any records responsive to his request. In response to Plaintiff's Appeal, the BOP further denied that there are any records responsive to his request, with respect to the targeted censorship of Plaintiff's mail.

398. Plaintiff had been hearing from inmates all around him, who had also been complaining, about others having discovered that their family members and friends were not receiving all of their mail as well, while they have been in the SMU.

51

399. In August 2016 Plaintiff began mailing all of his letters to LPP, within large manila envelopes marked as "LEGAL MAIL" to have a copy of his letters maintained on file at LPP for future reference. LPP would send him back the original along with one copy for him to personally retain.

400. LPP would mail Plaintiff his original letters along with his requested copy, and would inform him that they placed copies on file there. Plaintiff has a personal file that LPP retains for him.

401. Plaintiff had started to submit all of his legal mail to his Unit Counselor, Reese, who made sure that his "LEGAL MAIL" was processed accordingly.

402. On August 28, 2016, at around 8:40 P.M., Plaintiff submitted nine (9) letters to his range Officer, M. Delmonico, during his rounds, to be mailed out.

403. On August 29, 2016, at around 8:30 P.M., Plaintiff submitted eight (8) letters to his range Officer, G. Seagraves, during his rounds, to be mailed out.

404. Minutes before he submitted his letters to Officers Delmonico on August 28th and Seagraves on August 29th Plaintiff had his cellmate, Peter A. Karl, read each letter and then sign and date the upper left-hand corner of a copy of each of those letters, for future reference.

405. Mr. Karl also provided Plaintiff with a statement, signed under the penalty of perjury, identifying the above mentioned letters and stating that he witnessed Plaintiff submit those letters to Officers Delmonico and Seagraves, as described.

406. In addition, Plaintiff also wrote a statement, signed under the penalty of perjury, similar to the statement which Mr. Karl provided Plaintiff, which also included the addresses to those that his letters were addressed to which he submitted to Officers Delmonico on August 28th and Seagraves on August 29th.

407. Plaintiff sent his and Mr. Karl's statements to LPP within a few days after they were written, in order to have LPP record those on file at that time.

408. Sometime around the middle of September 2016, Plaintiff sent out a letter to one of his Churches Prison Ministry's pen-pal friends, Joe Branson, and asked him to call Plaintiff's mother, Brenda Mack, to find out whether she had received any of the last three letters that he had submitted to staff to be mailed to her. Which included, one of the nine letters that Plaintiff submitted to Officer Delmonico on August 28, 2016.

409. Enclosed within Plaintiff's August 20, 2016, letter to his mother he also sent a letter to his son - "Jamy," niece - "Allexis," and his uncle - "Uncle Tom," which were never received as well.

410. Late September, 2016, Plaintiff received a letter back from Mr. Branson informing Plaintiff that he called Mrs. Mack, per his request, and that she told him

that she had not received any of Plaintiff's last three letters that he had submitted to staff to be mailed to her, that which included his August 20, 2016, letter to her.

411. Mrs. Mack has since, personally, informed Plaintiff that she had not, in fact, received the above mentioned letters.

412. Plaintiff was also informed by his son, Toby, and brothers, Jason and Johnny, that they had, in fact, never received Plaintiff's letters which he wrote to them and submitted to Officers Delmonico on August 28th and Seagraves on August 29th, 2016.

413. On or about October 12, 2016, Plaintiff submitted an Informal Resolution Attempt complaining about the ongoing problems with his mail that he submits to staff to be mailed out, not being received by those whom his letters are addressed to, and also not receiving many letters which has been mailed to him by family members, his children, and others since his arrival to the SMU. And, among other things, requesting that the matter be thoroughly investigated.

414. After discovering that Plaintiff's family members had, in fact, not received his letters, which he submitted to Officers Delmonico on August 28, 2016, and Seagraves on August 29, 2016, to be mailed out to them, he wrote a "Preservation of Evidence Request" letter to the Warden, Ebbert, informing him that his staff had been throwing away Plaintiff's outgoing and incoming mail, placing the Warden on notice that he planned to seek judicial review of the matter, and requested that particular cell-block videotape footage of Plaintiff submitting his letters to Officers Delmonico and Seagraves be preserved for judicial review.

415. Plaintiff sent his "Preservation of Evidence Request" to Mr. Sprout and asked him to fax it to Warden Ebbert on his behalf. On October 6, 2016, Mr. Sprout Faxed Plaintiff's request to Warden Ebbert along with a cover-letter that he included.

416. On or about September 26, 2016, Plaintiff sent a FOIA/PA Request to the Office of the Inspector General's (OIG) Paralegal Specialist requesting a copy of his August 21, 2016, FOIA/PA Request of which he had submitted to Officer Delmonico on August 28, 2016, to be mailed. On October 26, 2016, the OIG responded to his September 26, 2016, FOIA/PA Request, informing him that they had not received his August 21, 2016, FOIA/PA Request.

417. On or about September 27, 2016, Plaintiff sent a FOIA/PA Request to the BOP's FOIA/PA Section for a copy of his "Complaint"/letter to the BOP's Bureau of Internal Affairs, dated August 20, 2016, of which he submitted to Officer Delmonico on August 28, 2016, to be mailed out. On November 15, 2016 the BOP responded to Plaintiff's September 27th FOIA/PA Request, informing him that they had not received his August 20, 2016, "Complaint"/letter to the BOP's Bureau of Internal Affairs.

418. On or about September 27, 2016, Plaintiff sent a FOIA/PA Request to the OIG's Paralegal Specialist for a copy of his August 21, 2016, letter to the OIG's Investigative Division, of which he submitted to Officer Seagraves on August 29, 2016, to be mailed. On October 26, 2016, the OIG responded to Plaintiff's FOIA/PA Request, informing him that they had not received his August 21, 2016, letter to the OIG's Investigative Division.

419. Plaintiff further discovered that other letters, which he submitted to Officer Delmonico on August 28, 2016, and Seagraves on August 29, 2016, to be mailed out, were, in fact, never received by those whom the letters were addressed to. And had not received any response back from any of those 17 letters which he submitted to Officers on August 28, 2016, and Seagraves on August 29, 2016.

420. In October 2016 Plaintiff received a letter from the Executive Director, Eric Corson, of Prisoner Visitation and Support (PVS) Organization confirming that they had, in fact, not received Plaintiff's August letter that he had Submitted to Officer Seagraves on August 29, 2016, to be mailed.

421. Plaintiff received a letter from his Church friend Kathleen "Kathi" Magnuson, confirming that she had, in fact, not received Plaintiff's August 20, 2016, letter, of which Plaintiff submitted to Officer Seagraves on August 29, 2016, to be mailed.

422. As described above, in paragraphs 198 through 201 and 234 through 236, USP Lewisburg staff unlawfully tampered with Plaintiff's mail while housed in G-Block Housing Unit.

423. While Housed in G-Block Housing Unit, Plaintiff submitted several letters, which were addressed to his family, friends, and others, to Lt. Beachel, to be mailed.

424. Plaintiff later discovered that his mother never received Plaintiff's letters, which he wrote to her for Mothers Day, and that his sons, brothers, and other family members never received his letters which he had submitted to Lt. Beachel, to be mailed, while he was housed on G-Block.

425. Plaintiff filed a couple of grievances to the Warden complaining about staff's unlawful censorship of his mail.

426. Plaintiff complained verbally to Defendants Jusino, Butler, and Kazuba about staff's unlawful censorship of his mail, on multiple occasions during their routine rounds in the SMU.

427. Upon information and belief, the Warden and his administration knew that their staff were unlawfully censoring SMU inmate's mail routinely through many inmate's complaints of this through the inmate Grievance procedure.

428. Despite Plaintiff's and other SMU inmate's complaints of this to the Warden

and his Administration, they permitted their staff to continue to unlawfully censor Plaintiff's mail.

## CAUSE OF ACTION

### Count VIII

### Plaintiff Jeremy Mack vs. Defendants Ebbert, Jusino, Butler, Kazuba, Doe, Beachel, Seagraves and Delmonico

### First Amendment Violation

429. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

430. Plaintiff's right under the First Amendment to the United Sates Constitution to Freedom of Speech was clearly established as of June 2015.

431. Defendants Beachel, Delmonico, Seagraves, and Doe violated Plaintiff's First Amendment rights by depriving him of his right to Freedom of Speech by unlawfully censoring Plaintiff's outgoing and incoming mail, without any penological purpose.

432. Defendants Ebbert, Jusino, Butler, and Kazuba violated Plaintiff's First Amendment right by depriving him his right to be free from unlawful censorship of his mail by permitting Defendants Beachel, Delmonico, Seagraves, and Doe to unlawfully censor Plaintiff's outgoing and incoming mail during his confinement in the SMU.

433. As a direct and proximate result of the said acts and omissions, Plaintiff suffered, and continues to suffer, the injuries and damages described, above, and is therefore entitled to relief.

## PRAYER FOR RELIEF

434. WHEREFORE, Plaintiff respectfully prays that this Court:

A. Declare that the acts and omissions described above violated Plaintiff's rights under the Constitution and the laws of the United States;

B. Order Defendants to pay compensatory and punitive damages;

C. Order Defendants to pay reasonable Attorney fees and costs; and

D. Grant other just and equitable relief that this Honorable Court deems necessary.

## PREVIOUS LAWSUITS

435. In 2015, acting Pro Se, Plaintiff brought a previous lawsuit before Judge Christopher A. Boyko in the United States District Court for the Northern District of Ohio, in Case Number 4:15-cv-1732.

## VERIFICATION

436. I, Jeremy Mack, declare and verify, pursuant to 28 U.S.C. ß 1746, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 30, 2019.

Respectfully Submitted,

Jeremy Mack, Pro Se
BOP Register No. 30155-160
United States Penitentiary Coleman-1
P.O. Box 1033
Coleman, Florida 33521

COVER LETTER

Office of the Clerk
United States District Court
for the Middle District of Pennsylvania
William J. Nealson Federal Bldg. & U.S. Courthouse
235 North Washington Avenue
P.O. Box 1148
Scranton, PA. 18501-1148

RE: Pro Se Filing Of My Complaint, and Filing Fees

Dear Office of the Clerk:

Greetings and good day! I have enclosed, with this, my 56-page Complaint, to be
filed with the Courts, along with two additional copies. Please return a file-
stamped copy to me. I have also enclosed a "NOTIFICATION OF DATE FILED" Form, in
accordance with Houston v. Lack.

I am paying the entire $350. Filing Fee, to have my Complaint filed with the Courts.
I have just begun the process of having the $350. released from my prison account
and forwarded to your Office, in a check payable to your Office. It usually takes
about two weeks for prison Officials to release funds from our prison account.

I will be mailing each Defendant in this matter a copy of my Complaint, two copies
of a Notice of a Lawsuit and Request to Waive Service of a Summons Form (AO 398),
a Waiver of the Service of Summons Form (AO 399), and a stamped envelope for the
Defendants to return by mail their "Waiver of Service of Summons." In compliance
with Fed.R.Civ.P. 4(d).

If I may be able to assist your Office in any way in this matter, please contact
me at the address set forth below and I will respond immediately to any inquiries.
Thank you very much for your time and assistance in this matter.

Respectfully submitted,

Jeremy Mack # 30155-160, Pro Se
U.S.P. Coleman-1, P.O. Box 1033
Coleman, Florida 33521

NOTIFICATION OF DATE FILED

I, Jermy Mack, declare pursuant to Title 28 U.S.C. ß 1746, that on:

_February 12, 2019_____

I submitted my 56-page Complaint to the Courts, Jeremy Mack v. BOP et. al., to
USP Coleman-1 prison staff within a sealed mailing package, properly addressed
to the Courts, with the proper amount of prepaid U.S. First Class postage, for
forwarding to the Courts. Which is deemed filed at the time it was delivered
to prison authorities for forwarding to the Courts. Houston v. Lack, 101 L. Ed.
2d 245 (1988).

Respectfully Submitted,

Jeremy Mack, Pro Se
BOP Register No. 30155-160
United Sates Penitentiary Coleman-1
P.O. Box 1033
Coleman, Florida 33521



This packaging is the property of the U.S. Postal Service™ and is provided solely for use in sending Priority Mail shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All Rights Reserved.

UNITED STATES POSTAL SERVICE®

FROM:
JEREMY MACK #30155-160
USP-1
P.O. BOX 1033
COLEMAN, FLORIDA 33521

TO:
OFFICE OF THE CLERK
UNITED STATES DIST COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAM J. NEALON FED. BLDG. & U.S. COURTHOUSE
235 NORTH WASHINGTON AVE.
P.O. BOX 1148
SCRANTON, PA. 18501-1148

LEGAL MAIL

RECEIVED
SCRANTON
FEB 2 0 2019
PER _____ DEPUTY CLERK

CERTIFIED MAIL

7015 1660 0000 2829 0616

U.S. POSTAGE PAID
PM 3-DAY
COLEMAN, FL
33521
FEB 14, 19
AMOUNT
$0.00
R2305H130354-09

1006    18501

DATE OF DELIVERY SPECIFIED*

USPS TRACKING™ INCLUDED*

INSURANCE INCLUDED*

PICKUP AVAILABLE
* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

VISIT US AT USPS.COM®